# EXHIBIT C

Copy number:
Name:



# Palmaz Scientific, Inc.

Confidential Private Placement Memorandum

Series B Convertible Preferred Stock

$20 Million

September 2011 / Confidential

Jefferies & Company, Inc.
Member SIPC



## About this Confidential Private Placement Memorandum

The terms, the "Company," "we," "us," "our," or similar terms and "Palmaz" and "Palmaz Scientific" refer to Palmaz Scientific, Inc., a Delaware corporation. The Company has prepared this Confidential Private Placement Memorandum (the "Memorandum") in connection with a private placement offering of its Series B Convertible Preferred Stock, par value $0.001 per share ("Series B Shares" or the "Securities") at a purchase price of $250 per share (the "Offering"). The Series B Shares are convertible into shares of the Company's common shares, par value $0.001 per share (the "Common Shares").

This Memorandum is highly confidential. The Company prepared it solely for use in connection with this offering. You may not reproduce, distribute or disclose the contents of this Memorandum, or any information contained in it, for any purpose other than considering an investment in the Securities or to anyone without our prior written consent other than to persons who are advising you in connection with this offering and who agree to keep that information confidential. If you do not wish to make an investment in the Company, you agree to return this Memorandum to Jefferies International Limited and Jefferies & Company, Inc. (together, "Jefferies" or the "Placement Agent") as soon as practicable, together with any other materials relating to the Company, which you may have received from Jefferies, the Company or its affiliates. By accepting delivery of this Memorandum, you expressly agree to the foregoing and to maintain the information contained in this Memorandum in confidence.

Neither the Securities and Exchange Commission (the "SEC") nor any state or foreign regulatory authority has approved the securities offered hereby or the terms of the offering or passed upon the accuracy or adequacy of this Memorandum. Any representation to the contrary is a criminal offense. This Memorandum does not constitute an offer to buy, or a solicitation of an offer to sell, securities in any jurisdiction where the offer or sale of such securities would violate applicable law.

You must comply with all applicable laws and regulations in any jurisdiction in which you purchase, offer or sell the Securities or possess or distribute this Memorandum. You must also obtain any consents or approvals that you need in order to purchase any of these Securities. We and the Placement Agent are not responsible for your compliance with these legal requirements.

The Securities have not been registered under the Securities Act of 1933, as amended (the "Act"), or applicable U.S. state or non-U.S. securities laws and are being offered and sold in the United States pursuant to the exemptions from the registration requirements of the Securities Act provided by Section 4(2) and/or Regulation D of the Securities Act and outside the United States to persons other than U.S. Persons or "non-U.S. purchasers" in reliance upon Regulation S under the Securities Act. These Securities may not be resold or otherwise transferred unless they are subsequently registered or an exemption from the registration requirement is available.

The securities of the Company have not been registered under the Securities Act or under the securities laws of any U.S. state. The Company is not subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and does not file reports, proxy statements and other information with the SEC. We cannot assure you that the Company will effect an initial public offering, become subject to these reporting requirements or that an active market for the Company's securities will develop.

This Memorandum has been prepared solely for informational purposes. It is being furnished to you to assist you in considering an investment in the Company and does not purport to contain all the information that you may desire. The information has not been independently verified and was provided by the Company and other sources deemed to be reliable. In all cases, interested parties should conduct their own due diligence investigation, analysis and evaluation of the Company, the offering and the information contained in this Memorandum. In addition, the information in this Memorandum is current only as of its date and may have changed since that date.

No person, including Jefferies, has been authorized to give any information other than that contained in this Memorandum, or to make any representations in connection with this offering. If given or made, such other information or representation must not be relied upon as having been authorized by the Company or Jefferies.

You should not construe the contents of this Memorandum as investment, tax or legal advice. You, your investment, tax or other advisors and your accountants and legal counsel should review this Memorandum, as well as the nature of the investment in the securities offered hereby.

Jefferies, its employees, agents or representatives do not make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this Memorandum, and nothing contained herein is, or shall be relied upon as a promise, representation or warranty. Jefferies has not independently verified any of such information, assumes no responsibility for its accuracy or completeness and shall have no liability for any representations (expressed or implied) contained in, or for any omissions from, this Memorandum or any other written or oral communications transmitted to the recipient in the course of their evaluation of the Company.

**Jefferies**

An investment in the securities described in this Memorandum is speculative and involves a high degree of risk.  Investors should understand that they will be required to bear the financial risk of any investment in these Securities for an indefinite period of time. Only investors who can bear the risk of loss of their entire investment in the securities offered hereby should invest.

The Company may withdraw, cancel or modify this offering at any time and without prior notice.  The Company reserves the right to increase or decrease the number of Securities and whether or not to sell these Securities at all.  The Company reserves the right to reject any prospective investment, in whole or in part, or to allot to any prospective investor less than the number of securities offered hereby that an investor desires to purchase.

Jefferies

## Forward Looking Statements

Much of the information in this Memorandum consists of "forward-looking statements" within the meaning of the U.S. federal securities laws, including without limitation, matters concerning the Company's financial condition, results of operation, plans, objectives, future performance and business. Statements that are not historical facts, including statements about the Company's beliefs and expectations, are forward-looking statements. Forward-looking statements include statements preceded by, followed by or that include the words "may," "could," "would," "should," "believe," "expect," "anticipate," "plan," "estimate," "target," "project," "intend," "potential" and similar expressions, words or phrases.

Forward-looking statements are subject to various risks and uncertainties that can cause actual results to differ materially from those implied by such forward-looking statements, including, without limitation, the following: unanticipated increases in operating costs, labor disputes, capital requirements, increases in borrowing costs, product demand, pricing, market acceptance, changes in clinical testing and changes in accounting protocols, policies or guidelines may cause the Company's financial condition to be perceived differently, legislative or regulatory changes may adversely affect the Company's business, intellectual property rights and litigation, and risks in product and technology development that may be more difficult or expensive than the Company anticipates. Given the multitude of risks and uncertainties and other factors involved (many of which are beyond the Company's control), actual results may differ materially from those expressed or implied by such forward-looking statements.

Forward-looking statements speak only as of the date of this Memorandum. Except as required by applicable law, neither the Company nor Jefferies, or any of their respective affiliates, has any obligation to update or otherwise revise any forward-looking statements, including any revisions to reflect changes in economic conditions or other circumstances arising after the date hereof or to reflect the occurrence of unanticipated events. You should consider these risks and uncertainties in evaluating forward-looking statements, and you should not place undue reliance on these statements.

Because of the confidential nature of this transaction, all communication or inquiries relating to the Company should be directed to Jefferies. You should not directly contact the Company or any of its directors, officers, employees, shareholders, customers, vendors or related parties or affiliates at any time.

Jefferies has been engaged by the Company to assist the Company in raising its Series B Convertible Preferred financing.  Neither the Company nor its shareholders should be contacted directly.  Upon request, the recipient of this Memorandum will promptly return all evaluation materials, including this Memorandum, received from the Company or Jefferies or any other representative of the Company, without retaining any copies thereof. The Company and Jefferies reserve the right, without notice, at any time to amend, suspend, terminate or otherwise change the Offering procedures.

**Jefferies**

All inquiries with respect to this Memorandum should be directed to:

**Jefferies & Company, Inc.**
520 Madison Avenue
New York, NY 10022

| Healthcare Investment Banking | Private Placements | Wealth Management |
| --- | --- | --- |
| Kevin Sheridan<br>Managing Director<br>(212) 707-6431<br>ksheridan@Jefferies.com | David Bohn<br>Managing Director<br>(212) 336-7368<br>dbohn@Jefferies.com | Mark Peters<br>Head of Wealth Management<br>(212) 323-3366<br>mpeters@Jefferies.com |
| Jeff Ammerman<br>Vice President<br>(415) 229-1410<br>jammerman@Jefferies.com | Kamlesh Bhatia<br>Managing Director<br>(212) 336-7447<br>kbhatia@Jefferies.com | Rob Pereira<br>Vice President<br>(212) 284-2286<br>rpereira@Jefferies.com |
| James Brandon<br>Associate<br>(212) 336-7495<br>jbrandon@Jefferies.com | Megan Smyth<br>Vice President<br>(212) 336-7358<br>msmyth@Jefferies.com | |
| Kyle Cresci<br>Analyst<br>(212) 284-2045<br>kcresci@Jefferies.com | Charlie Glazer<br>Analyst<br>(212) 336-7360<br>cglazer@Jefferies.com | |

**Jefferies**

## Table of Contents

Executive Summary                                          1

Investment Highlights                                      4

The Offering                                               6

Market Opportunity                                         8

Company Overview                                          13

Ownership                                                28

Notice to Investors                                      29

Risk Factors                                             30

Appendix                                                 39

Jefferies

# Executive Summary

*This summary highlights selected information contained in greater detail elsewhere in this Memorandum.  As a result, it does not contain all of the information that you should consider before investing in the securities offered by this Memorandum.  You should read the entire Memorandum carefully, including the "Risk Factors" and "Forward-Looking Statements" sections.*

## MISSION

***Create safer, more predictable implantable prosthetic devices improving patient outcomes and quality of life.***

## STRATEGY

Palmaz Scientific develops innovative devices based on a nanotechnology platform that leverages its breakthrough discoveries for pro-healing bio-metals, thin film metals and micron level surface patterning into medical device products, intellectual property licensing opportunities, funded development, joint ventures and/or other strategic partnerships.  The Company's Self Expanding Super-Elastic All-Metal Endoprosthesis ("SESAME") Stent is in the European CE Mark approval process.  We are in development of prototype stents to treat vascular disease of the coronary artery and neuro arteries of the brain as well as a pudendal artery stent to treat erectile dysfunction.

## POTENTIAL GAME CHANGING PRODUCTS BASED UPON NANOTECHNOLOGY PLATFORM

A decade of research has resulted in 117 issued U.S. and international patents and 109 active U.S. and international patent applications in process primarily from three important discoveries.

1.  Biometals of high purity and ordered structure can be fabricated using physical vapor deposition.

2.  Thin film metals can be used to produce low profile implantable devices.

3.  Topographical patterns at the microscopic level can positively influence cell colonization of prosthetic surfaces.

Based on a deep understanding of tissue and blood interactions with metal surfaces at the atomic and molecular levels, Palmaz Scientific designed and engineered nanotechnology processes using physical vapor deposition ("PVD") and innovative nanotechnology designs to produce thin film metals of thickness as small as 5 microns (i.e. the approximate size of one blood cell). The PVD process deposits layers of atoms on a substrate to produce very strong, high purity thin film metals that can be formed into low profile implantable medical devices.  In addition, a proprietary patented metal surface micro design has been found to accelerate the healing process of these implantable medical devices.  These discoveries and others form a comprehensive technology portfolio of 117 issued U.S. and international patents and 109 active U.S. and international patent filings including, but not limited to medical devices, nanotechnologies, engineered surfaces and unique manufacturing processes that produce high purity metals that are stronger and capable of constructing low profile implantable medical devices (i.e. widths smaller than 75 microns) that accelerate the healing process.  This approach to implantable medical device structure is believed to be unique and a potential game changing technology platform for the future of implantable medical devices.

The Palmaz Nanotechnology Platform has many potential applications that may benefit:

- Thin Film Covered Stents
- Monolithic Thin Film Stents
- Implantable Bioreactor Platforms for Cell Lines
- Cancer Drug Delivery
- Vascular Drug Delivery (Bare Stents, Covered Stents, Grafts, Balloons)
- Valves (Heart, Venous)
- Surgical and Endovascular Patches

- Grafts (Peripheral, A/V, CABG)
- EPDs (Embolic Protection Devices)
- Occlusion Devices
- Bare Metal Stents
- Angioplasty Balloons
- Wires, Sheaths, Delivery Systems
- Cosmetic and Orthopedic Implants
- Erectile Dysfunction ("ED") indications

**Jefferies**

## PRODUCTS PIPELINE

| Product | Description |
|---------|-------------|
| Micro Grooved Coronary Stent | ▪ Patented Parallel Grooves in the inner surface for accelerated healing<br>▪ Improved performance over conventional bare metal stents while avoiding the threat of thrombosis associated with drug eluting stents |
| ED Micro Stent | ▪ Very low profile stent for the treatment of erectile dysfunction<br>▪ Treating erectile dysfunction through angioplasty stenting expected to become common in the near future |
| Micro-Neuro Stent | ▪ Specifically designed for intracranial vessel implant<br>▪ Engineered for fast endothelial cell coverage |
| SESAME Stent | ▪ All metal micromesh stent for highly embologenic applications such as angioplasty-stenting of coronary artery bypass graft<br>▪ European CE Mark application for SESAME Stent was filed in May 2009. |
| Micromesh Carotid Artery Stent | ▪ Larger version of SESAME<br>▪ Micromesh cover may reduce the routine use of embolic protection devices |

## THIRD PARTY RELATIONSHIPS & OPPORTUNITIES

The Company's extensive intellectual property portfolio is the foundation for a technology platform with many potential medical device applications, particularly in orthopedics and cosmetic prosthetic specialties. To commercialize more applications more quickly, the Company will seek out third parties to license the technology to these third parties in return for royalties. We expect that a focus on a licensing strategy will yield a consistent and recurring royalty revenue flow that may become a primary revenue source to the Company. Additional opportunities with third parties would be to fund development or enter into joint ventures.

## MANAGEMENT & BOARD

**Julio Palmaz, MD**, Chairman & Chief Scientist

World renowned doctor, scientist and inventor widely recognized as the father of the heart stent, identified as one of ten patents that changed the world. His early stent research artifacts are now part of the medical collection of the Smithsonian Institution in Washington, DC and the Texas History Museum in Austin, TX. He holds the Ashbel Smith Professorship as a tenured Professor at the University of Texas Health Science Center at San Antonio.

**Steven Solomon**, Chief Executive Officer & Director

Entrepreneur, investor and founder of several successful companies including Parago, Citadel Security Software, acquired by McAfee Inc. and CT Holdings, a technology incubator. He has substantial experience in public and private equity and debt financings, mergers and acquisitions, restructurings and executive management.

**Richard Connelly**, Chief Financial Officer

More than 35 years of public and start up company experience including financial management positions with Texas Instruments and Sterling Software and as CFO for Citadel Security Software, Riptide Worldwide Inc., Photomatrix Corporation, Answersoft Inc., JusticeLink Inc., and Asset-Intertech Inc.

**Philip Romano**, Director

Investor, entrepreneur, artist, and nationally renowned restaurateur. He is the creator of the restaurant concepts for Fuddruckers, Romano's Macaroni Grill, Spageddies, Cozymel's, Rudy's Country Store and BBQ and eatZi's Market & Bakery. He is a co-founder and general partner in Scientific Health Development, a fund that is an early stage investor in medical device, nutraceutical and pharmaceutical companies and was founder and partner of American Institute of Gastric Banding, Ltd.

**Christopher Banas**, Director

Over 30 years experience in the chemical, microelectronics and medical device industries, with C.R. Bard, Inc, Guidant/ACS, Inc and W.L. Gore, Inc., Roy C. Ingersoll Research Center/Borg Warner Chemicals, Volcano Corporation and founder of CardioSpectra, Inc, acquired by Volcano.

**Jefferies**

## SCIENTIFIC ADVISORY BOARD

- Renu Virmani, MD., Medical Director CVPath, International Registry of Pathology, Gaithersburg, Maryland
- Steven R. Bailey, MD., Chief of the Janey and Dolph Briscoe Division of Cardiology, University of Texas Health Science Center at San Antonio
- Mark Jenkins, MD., Interventional Cardiologist, Dallas, Texas
- Barry T. Katzen, MD., Director Baptist Cardiac & Vascular Institute, Miami, Florida
- Peter Fitzgerald, MD., Director of the Center for Cardiovascular Technology and Director of the Cardiovascular Core Analysis Laboratory at Stanford University Medical School
- Robert Bersin, MD., Director of endovascular services, Seattle Cardiology, Seattle, Washington
- Frank J. Criado, MD., Vascular Surgeon and Interventionalist at Union Memorial Hospital, Baltimore, Maryland
- Jose Antonio Condado, MD., Doctor of Cardiology at Trinity Medical Center, Caracas, Venezuela
- Robert S. Schwartz, MD., Medical Director at the Minnesota Cardiovascular Research Institute, and Cardiologist at the Minneapolis Heart Institute

## CURRENT INVESTORS

A prominent group of investors in the Company includes Dr. Julio Palmaz, Philip Romano, Steven Solomon, Christopher Banas, the Johnson & Johnson Company and the State of Texas Emerging Technology Fund as well as many individuals and investment funds located around the world.

## INVESTMENT SUMMARY

Palmaz Scientific is seeking to raise $20 million of Series B Convertible Preferred Stock ("Series B Shares").  See Subscription Agreement for details of terms and conditions.  The securities are speculative, and this offering involves substantial risks (please see "Risk Factors" and read the important disclaimers at the front of this document) and should be considered only by those persons who can afford the risk of loss of their entire investment.



NiTi Balloons



SESAME Stent



Micro Grooves on Stent Strut



Micro Stent Prototype

**Jefferies**

## Investment Highlights

- **Large, growing coronary artery disease market.**
  Currently Coronary Artery Disease ("CAD") is a leading cause of death (650,000 / year) and affects 13 million Americans. The total coronary market size is nearly $6.0B – with bare metal stents comprising $1.0B of this market. The Palmaz Scientific micro grooved coronary stent has the potential to make large inroads into the bare metal stent market (where there has been little innovation over the last 10 years) and could eventually find its way into the drug eluting stent market as the industry continues to shift towards the pro-heal approach.

- **Emerging opportunity within the neurovascular aneurysm market.**
  It is estimated that there are 200,000 aneurysms that are treatable annually worldwide. Currently the default treatment option is the use of embolic coils which requires multiple coils per aneurysm. Meanwhile, this procedure still suffers from recurrence rates from 20% to 50% (depending on the size of the aneurysm).

  An alternative method of treatment that is gaining traction is through flow diversion via a pipeline embolization device ("PED"). Only one true PED device is currently available (made by ev3 / Chestnut Medical). However, that device suffers from foreshortening issues and the potential to occlude perforating arteries. The Palmaz Scientific micro neuro stent has minimal foreshortening, thus providing better placement predictability, and experiences less occlusion of perforating arteries due to its variable density design. Currently the U.S. micro neuro stent opportunity using this new therapeutic modality is $300M +.

- **Potential for stents to be used to treat erectile dysfunction ("ED").**
  It has been reported that men with ED have a 40% higher risk of developing CAD than men without ED.  ED predates CAD symptoms by 3+ years and 75% of men with CAD have ED.  The Company believes that this is a large potential market. Medtronic initiated the SZEN trial in 2009 to investigate stent placement in the pudendal artery as a treatment option for ED. Results are expected in 2011.

  The Palmaz Scientific micro stent is an excellent candidate to address this indication.  It is expected that angioplasty stenting for ED will become common in the near future.  Analyzing the anatomy of the pudendal artery it is clear that the access will require small and flexible delivery systems and the small diameter of the artery will demand low profile stents. Also the fact that a large proportion of the pudendal artery lesions are at the point where the pudendal artery exits the pelvic floor may necessitate self expanding stents to minimize crush damage by external compression.

- **Next generation patented medical device platform.**
  A decade of research and development by Julio Palmaz and his team has led to three important discoveries relevant to various implantable medical devices and that drive the Palmaz Scientific device platform. The first is that it is possible to create implantable medical devices with biometals of high purity and finely ordered structure through the use of thin film physical vapor deposition. Second, fabricating certain topographical patterns at the microscopic level will positively influence cell colonization, thus promoting site healing. Thirdly, thin film metals can be used to produce low profile implantable devices.

  Palmaz Scientific has applied these tenets to its medical technology platform in order to create better, more effective and safer stents. By utilizing thin-film physical vapor deposition the Company is able to create low profile stents made of high purity metal. This manufacturing process also enables the Company to apply micro groove patterns to the stent which function to favorably modify cell migration patterns. Moreover, since the Company is able to produce very thin, highly ordered structures, its stents come with a micromesh cover over the body of the stent; this helps to reduce the occurrence of restenosis and thrombosis.

- **Experienced, proven management team.**
  Julio Palmaz, M.D., Co-Founder and Chief Scientist of Palmaz Scientific, is an industry luminary and inventor of the first balloon expandable stent approved by the FDA in 1991. Dr. Palmaz served as the Chief of Angiography and Special Procedures at the University of Texas Health Science Center at San Antonio from 1983 until 1999 when he was appointed Chief of Cardiovascular and Interventional Radiology Research. Steve Solomon, Co-Founder and Chief Executive Officer of Palmaz Scientific, has over 20 years experience in public and private equity, mergers and acquisitions and executive management. Mr.

**Jefferies**

Solomon was the former CEO of Citadel Security Software (sold to McAfee in 2006) and prior to that was the CEO / Founder of Parago, Inc.

- **Extensive intellectual property portfolio.**
  Palmaz Scientific has built a very in-depth intellectual property portfolio that currently includes 117 issued U.S. and international patents and 109 active U.S. and international patent filings in active review globally. The Palmaz Scientific patent portfolio encompasses enabling technology that covers methods of making the biomaterials used in the Company's devices and universal material properties.

  Among the universal enabling technology, the Company holds issued patents covering i) stent surface patterning for promoting endothelialization, ii) stents and implantable devices made of materials having highly controlled surface heterogeneity and methods of making implantable endoluminal devices by vacuum deposition, iii) high strength, high strain tubular nitinol films, iv) microporous metal thin films, and v) monolithic medical device structures.

- **Multiple medical device applications.**
  Aside from the current SESAME, coronary and micro neuro stent products in active development by Palmaz Scientific, there are a number of other medical device applications that could benefit from the Palmaz Scientific technology platform. Furthermore, the Company's intellectual property portfolio includes patents covering an array of these potential product applications such as: drug delivery devices, valves (cardiac and venous), grafts (e.g. peripheral, arterio-venous, CABG), embolic protection devices, angioplasty balloons, occlusion devices, and several others.

**Jefferies**

## The Offering

Palmaz Scientific Inc. is seeking to raise approximately $20 million, before transaction costs and fees, of Series B Convertible Preferred Stock (the "Series B Shares").  The Series B Shares are being offered only to accredited investors and will not be registered.  Subscriptions will only be made upon acceptance by the Company of a completed subscription agreement.  See the attached "Subscription Agreement" for the details and the requirements of the offering and the "Risk Factors" section of this Memorandum.  We anticipate that we will need to raise additional funds in the future.

### USE OF PROCEEDS

The net proceeds of the offering are expected to be used to continue the covered stent program, for advancing the Micro Neuro Stent and the Micro Grooved Coronary Stent to clinical studies, for capital expenditures, to repay debt and for general working capital purposes.  A portion of the proceeds from this offering will be used to pay various professional fees and commissions that are common in an offering of this magnitude.

### SUMMARY OF TERMS OF THE SERIES B SHARES OFFERING

| | |
|---|---|
| Security | Series B Shares ("Series B Shares"). |
| Number of Shares | Approximately 80,000 Series B Shares, convertible into 8,000,000 Common Shares. |
| Purchase Price Per Share | $250.00 per Series B Share, which would represent an as-converted purchase price of $2.50 per share of common stock. |
| Aggregate Offering | Approximately $20 million before transaction costs & fees (estimated at $2,000,000). |
| Expected Closing Date | The initial closing would take place as soon as practicable following completion of definitive agreements.  The Company may sell the balance of any unsold Series B Shares at any time following the initial closing.  The Company has filed a certificate of designation for 120,000 Series B Shares. |
| Minimum Investment Size | $100,000.00 |
| Capitalization | See capitalization table further in this document. |

### RIGHTS, PREFERENCES AND PRIVILEGES OF THE SERIES B SHARES

| | |
|---|---|
| Dividends | The holders of the Series B Shares shall be entitled to receive dividends in preference to the common stock ("Common Stock") and on parity with the Company's outstanding shares of Series A, A-1 and A-2 Preferred Stock, when, as and if declared by the Company's Board of Directors (the "Board"). |
| Liquidation Preference | In the event of any liquidation or winding up of the Company, the holders of the Series B Shares and the holders of the Company's Series A, Series A-1 and Series A-2 Shares shall be entitled to receive in preference to the holders of the Common Stock, a per share amount equal to the liquidation price of such series.  All remaining assets available for distribution shall be distributed ratably to the holders of the Common Stock. |
| Optional Conversion | The holders of Series B Shares will have the right to convert, at any time, each share of Series B Shares into 100 shares of Common Stock. |
| Automatic Conversion | The Series B Shares shall be automatically converted into Common Stock upon (a) the approval of holders of a majority of the Series B Shares then outstanding, (b) the closing of a public offering of the Company's Common Stock or any event (including a merger) pursuant to which the shares of the Common Stock become publicly traded, or (c) three years from the Closing Date. |
| Conversion Rate and Adjustment of Conversion Rate | Each share of the Series B Shares is initially convertible into 100 shares of Common Stock.  Proportional adjustments will be made to the conversion rate of the Series B Shares for capital reorganizations, stock splits, reclassifications, etc.  In addition, the conversion rate of the Series B Shares shall be adjusted on a broad-based weighted average basis in the event the Company issues additional shares at a per share purchase price less than the conversion price of the Series B Shares, other than: |
| | (i) shares of Common Stock issuable upon conversion of the Series B Shares or other series of preferred stock; |
| | (ii) shares issued as a dividend on the Series B Shares or other series of preferred stock; |
| | (iii) shares issued to employees, officers, directors, consultants or other service providers; |
| | (iv) shares issued to banks federal or state government funded programs, or equipment lessors; |
| | (v) shares issued in connection with collaboration, technology license, development, OEM, marketing, |

**Jefferies**

distribution, customer or other similar agreements or strategic partnerships;

(vi) shares issued in connection with a bona fide acquisition of or by the Company;

(vii) shares issued in a public offering; and

(viii) other exclusions set forth in the Company's Series B preferred stock and customary exclusions.

Redemption ........................................ The Series B Shares will not be redeemable.

## OTHER

Transaction Documents ......................... The sale of the Series B Shares will be made pursuant to a stock purchase agreement drafted by Company counsel containing customary representations and warranties.

Expenses .............................................. Each investor and the Company shall bear their own legal expenses in connection with the sale of the Series B Shares.

Market Standoff .................................... All holders of Series B Shares will agree not to sell any shares of Common Stock for 180 days following the closing of a public offering by the Company, provided the Company's officers, directors and greater than 5% stockholders enter into similar agreements.

Non-Binding Term Sheet ...................... Nothing contained in this Summary of Proposed Terms shall give rise to any liability or obligation on the part of the Company.  This Summary of Terms is non-binding and for discussion purposes only, and the terms of the financing, if any, may vary from the terms outlined in this Summary of Proposed Terms.  No past, present or future action, course of conduct, or failure to act relating to the transactions or proposals referred to in this Summary of Terms or relating to the negotiation of the terms of such transactions or proposals will give rise to or serve as the basis for any obligation or other liability on the part of the Company or any of its affiliates.  The information herein is considered confidential and shall not, except with the written permission of the Company, be distributed or discussed with any outside party other than financial and legal counsel.

**Jefferies**

## Market Opportunity

Currently Coronary Artery Disease ("CAD") is a leading cause of death (650,000 / year) and affects 13 million Americans. The total coronary market size is nearly $6.0B – with bare metal stents comprising $1.0B of this market. The Palmaz Scientific micro grooved coronary stent has the potential to make large inroads into the bare metal stent market (where there has been little innovation over the last 10 years) and could eventually find its way into the drug eluting stent market as the industry continues to shift towards the pro-heal approach.

### LIMITATIONS OF TODAY'S STENT TECHNOLOGY

Dr. Palmaz is widely recognized as the inventor of the first commercially available intravascular stent for coronary arteries. Even though Dr. Palmaz invented the first commercially available stent, he knew that his original stent design and those designs that followed later could be significantly improved with respect to their healing and therapeutic properties.  Today's stents are manufactured using stretching, grinding, heating and welding processes.  These processes create stents that look clean and shiny and continue to benefit millions of patients since first introduced in the 1990's.



Magnified Stent Strut



Stent

However at the surface level of the stent, one can see grease spots at the crystal level and cracks and breaks in the polymer coating of coated stents.  Both of these situations will inhibit cell growth slowing the healing process or perhaps leading to late stent thrombosis or restenosis.



Grease spot at crystal level



Coated Stent Polymer Cracks

The intravascular stent was perceived as a revolutionary alternative to open vascular repair because of the peculiar ability of the device to become incorporated into the diseased arterial wall by healthy tissue.  The stent not only provides an open passageway for blood to circulate but also, a framework for new tissue to grow and reconstitute something similar to a normal arterial wall. His invention revolutionized cardiovascular medicine and created a market that generates in excess of $5 billion of revenue annually. However, bare metal stents ("BMS") are subject to restenosis.

**Jefferies**

To diminish this untoward outcome, the industry developed the drug-eluting stent ("DES") with the first DES receiving FDA approval in 2003. This device releases antiproliferative drugs (generally contained in a polymer coating) over time in the surrounding tissues and decreases the incidence of restenosis so effectively that the indication for the use of stents was extended to patients who were regarded as poor stent candidates before DES. Since the drugs used for the DES limit tissue growth, such as is the case with other anticancer drugs, some feared incomplete healing of the stent.

After a few years of DES use it was apparent that tissue growth was inhibited to such an extent that the stent and the drug-eluting polymer matrix remained exposed, except by scant protein and incomplete cell coverage. This leaves a risk of sudden clotting even years after initial stent placement. Although highly effective despite this limitation, the work principle of DES is fundamentally opposite of what is pursued in all implantable devices. Tissue incorporation should be promoted, not antagonized by interfering with cell metabolism.

### Vascular Stenting



**a.** The atheromatous plaque blocking the lumen of the vessel

**b.** Plaque is displaced outwardly by the balloon and the stent, enlarging the vessel outside diameter

**c. Problem:** After removal of the balloon, the plaque material extrudes through the stent openings and is released into the lumen as particles that embolize downstream

### How Restenosis Occurs With Today's Stents

The struts of a bare metal or drug eluting stent dig into the plaque material on the walls of the vessel after deployment, producing an inflammatory injury.  DES has an added problem as cells do not attach to polymers as readily as they do to high purity metals, and over time polymers may become brittle, crack and create voids in cell layer coverage on the stent surface.



The injury and inflammation cause proliferative restenosis, leading to loss of the luminal diameter gained from the stent procedure.



**Jefferies**

## THE PALMAZ SOLUTION

To address the restenosis and clotting issues, Dr. Palmaz and his colleagues determined that the first practical project arising from the Palmaz Nanotechnology Platform was the all metal micromesh covered stent designed to address potentially embologenic targets (sites prone to release particles downstream during angioplasty and stenting).

### The All Metal Micromesh Covered Stent



**Solution:** The Palmaz Scientific all metal micromesh covered stent holds the material in place preventing embolization, thus constituting a pre-emptive embolic protection device.

### How The All Metal Micromesh Stent Inhibits Restenosis

Using the Palmaz Nanotechnology Platform the Company can produce a high purity all metal micromesh stent covering with a thickness of 5 microns or less. The mesh openings are less than 100 microns and act as a screen to prevent migration of the stent struts into the plaque.



The avoidance of injury and inflammation prevents proliferative restenosis and loss of lumen.



## PALMAZ NANOTECHNOLOGY PLATFORM

At the heart of the Palmaz Nanotechnology Platform are discoveries regarding how tissue and blood interact with prosthetic metal surfaces at the atomic and molecular levels. To study these phenomena, Dr. Palmaz formed Advanced Bio Prosthetic Surfaces Ltd. ("ABPS") in 1999 to advance metal surface technologies using physical vapor deposition and molecular and cellular biology to develop advanced biocompatibility of materials used in implantable medical devices. Palmaz Scientific was formed in 2008 to continue the research and development begun by ABPS and to also pursue the commercialization of advanced metallurgical surface nanotechnologies for the manufacture of implantable medical devices.

Metals used in the manufacture of implantable medical devices are fraught with impurities that make the healing process unpredictable and chaotic, resulting in adverse events such as stent thrombosis and restenosis. To address these issues Dr. Palmaz looked at the interactions of blood and tissue with material surfaces at atomic and molecular levels. He believes that reducing or eliminating impurities and the random variability in the structure of the material would make the healing process predictable.

This research on how tissue and blood interact with prosthetic metal surfaces at the atomic and molecular levels led Palmaz Scientific to three important discoveries:

1.    Biometals of high purity and ordered structure can be fabricated using physical vapor deposition.

2.    Thin film metals can be used to produce low profile implantable devices.

3.    Topographical patterns at the microscopic level can positively influence cell colonization of prosthetic surfaces.

**Jefferies**

The leadership of ABPS put together a unique group of scientists, engineers and technologists combining metallurgy, high vacuum physical and chemical vapor deposition and molecular and cellular biology expertise. In a few years, breakthrough developments made by the group yielded high purity, optimized materials and techniques allowing controlled fabrication methods not seen before, such as patterned ultra-thin 3D metal structures, suited for device development.  From this effort, other important concepts arose, namely the importance of cellular guidance by topographical surface features and controlled material heterogeneities for optimizing cellular interactions with material surfaces.

Thin metal films can be built using physical vapor deposition ("PVD"), a process similar to that used in the semiconductor industry. PVD results in high purity metals, which promote cell growth, and high strength metal structures to form low profile devices which allow for stenting of sites not targeted with previously available technology.



The first practical project arising from this array of capabilities was the all metal micromesh covered stent designed to address potentially embologenic targets (sites prone to release particles downstream during angioplasty and stenting). This consisted of a very fine mesh of vacuum deposited metal, roughly 5 times thinner than a human hair, covering a conventional stent frame.



The photomicrograph above illustrates the construction of the Company's all metal micromesh thin film covering.  (130x magnification)

The mesh prevents particles from dislodging and occluding vessels downstream, constituting a pre-emptive embolic protection for sites prone to this complication such as degenerated coronary saphenous vein bypass, carotid and renal arteries. Other devices were prototyped taking advantage of the unique design flexibility of this technology, including a metal balloon, cardiac valves, surgical mesh, surgical bypass conduit, embolic protection filter and other devices.

**Jefferies**

Thin films are thin metal deposits ranging from nanometers to millimeters in thickness. Thin film technology is not expensive to implement allowing for cost-effective enhancement to therapeutic outcomes from the implantable medical devices. Dr. Palmaz developed vapor deposition process and a patterned laser technique which results in a high strength, high purity low profile metal device. The Company initially used this process to create an all metal micromesh (<5 microns thick) covering of high purity to prototype an all metal micromesh covered stent.




Furthermore the body of knowledge regarding how tissue and blood interact with metal surfaces revealed that a unique surface micro-patterning design accelerated the attachment of endothelial cells to the metal surface. Micro engineered grooves ("Micro Grooves") induce powerful effects on cell behavior:



- Surface chemical and structural homogeneity for optimized cell attachment.
- Faster surface cell population by favorably modifying cell migration patterns.
- Surface capture of favorable adhesive proteins for selective promotion of adhesion of endothelial cells.

These processes and technologies were first developed to improve vascular stents but it was soon realized that all implantable medical devices could potentially benefit from these discoveries.



Stent with Micro-Grooves – Magnification Approximately 400x

**Jefferies**

## Company Overview

### WELCOME TO THE FUTURE

*"Create safer, more predictable implantable prosthetic devices improving patient outcomes and quality of life."*



Led by Dr. Julio Palmaz and a proven management team of executives, physicians, scientists, and engineers, Palmaz Scientific was created in 2008 with a vision to provide a technology platform that innovates medical device science. Today this vision is realized and supported by 117 issued U.S. and international patents and 109 active U.S. and international patent filings on its technologies including thin-film technologies and physical vapor deposition process innovations to produce more reliable implantable prosthetic devices. With an innovative approach to the design and manufacture of implantable materials, Palmaz Scientific is poised to leverage its intellectual property portfolio to create safer and more predictable implantable prosthetic devices.

The Palmaz Nanotechnology Platform is a potentially game-changing technology, addressing many potential applications that could provide Palmaz Scientific entry into several multi-billion dollar market categories including:

- Thin Film Covered Stents
- Monolithic Thin Film Stents
- Implantable Bioreactor Platforms for Cell Lines
- Cancer Drug Delivery
- Vascular Drug Delivery (Bare Stents, Covered Stents, Grafts, Balloons)
- Valves (Heart, Venous)
- Surgical and Endovascular Patches

- Grafts (Peripheral, A/V, CABG)
- EPDs (Embolic Protection Devices)
- Occlusion Devices
- Bare Metal Stents
- Angioplasty Balloons
- Wires, Sheaths, Delivery Systems
- Cosmetic and Orthopedic Implants
- Pudendal Artery Stent to treat erectile dysfunction

Palmaz Scientific has discovered a better way to manufacture stents and most other implantable medical devices. With this capability Palmaz Scientific plans to commercialize several products, including the SESAME Stent, the Micro Neuro Stent and the Micro Grooved Coronary Stent.

### PRODUCT PORTFOLIO

Our covered stent program includes the **SESAME Stent**, an all metal micromesh stent composed of a frame and a micromesh metal cover for highly embologenic applications. The cover is a less than 5 micron nitinol film etched by laser and micro-welded on the frame. The openings in the axially expandable mesh, approximately 100 microns wide, prevent fragments of friable plaque material from embolizing downstream. This is a limitation in angioplasty-stenting of coronary artery bypass graft ("CABG"), carotid bifurcation and renal arteries, where significant embolic complications are associated with vascular instrumentation.  Currently, we believe that there is no thin film device for pre-emptive embolic protection such as our covered stent.  The CE Mark application for SESAME Stent was filed in May 2009.

**Jefferies**



**Sizes**

Diameter:      4.1  mm
                 4.8  mm
                 5.8  mm

Cover Thickness: <5 micron









**Micro Neuro-stent**



Next-generation low profile stent (top) vs. current stent size (bottom)

**Jefferies**

The **Micro Neuro-stent** will be specifically designed for intracranial vessel implant.  The intracranial arteries are 8 times thinner than coronary vessels and far more susceptible to damage by instrumentation.  These vessels require devices engineered specifically for this application, having more flexibility and more delicate stenting action than a coronary counterpart.  To this effect, our Neuro-stent is approximately half the thickness of a coronary stent and it has a larger expandability ratio.  The cell size and the struts are approximately 1/3 the size of the average coronary stent design.  What makes these features possible is the vapor-deposited alloy characteristics.  Our basic manufacturing process, physical vapor deposition or PVD, yields a material of higher purity and therefore homogeneous crystal arrangement and structure.  Vapor deposited alloy has superior metallurgical characteristics allowing for micromachining which is impossible with conventional medical grade tubing.

To complement its superior mechanical characteristics, the Neuro-stent has its inner surface engineered for fast endothelial cell coverage.  This is attained by microscopic parallel grooves on the flow surface, designed for maximum cell guidance effect, accelerating endothelial cell migration 100% over flat conventional surfaces.   This is without using any cover material, which is prone to decay, delamination and potential long-term adverse effects.  The Neuro-stent surface is 100% pure alloy optimally oxidized for best blood and tissue interaction.

## Coronary stent

Our **Coronary Stent** will include our technology platform that will be used for our Neuro-stent: Vapor-deposited material and Microengineering of the flow surface. Either self-expanding or balloon-expandable platforms will carry our **Patented Parallel Grooves** in the inner surface for accelerated healing.  The mechanical characteristics of the stent will be optimized thanks to the superior qualities of our vapor deposited material.  Higher alloy strength will allow for lower profiles while radiopacity will be enhanced by the unique flexibility PVD has in introducing high atomic weigh components into the material. Low profile designs, high purity materials free of contaminants and the micro-grooved flow surface will result in improved performance over conventional bare metal stents ("BMS") while avoiding the threat of late adverse effects associated with polymer covers and drugs. In other words, our coronary stent will have all the advantages of the BMS, including the avoidance of long-term anti-thrombotic medication and the proven long-term reliability. This is in addition to the improved short-term performance of our platform.

## Pudendal Artery Stent

The majority of male impotence (erectile dysfunction, ED) is related to atherosclerotic obstructive lesions of the internal pudendal artery, the main supply to the erectile tissue of the penis. The high correlation of ED with coronary artery disease points to the fact that this is the result of an underlying cause, such as endothelial cell dysfunction. Therefore, the incidence of symptomatic ED is as prevalent as coronary disease, with an estimated 100M males affected worldwide.

New catheter and imaging technologies promise to extend the benefits of angioplasty and stenting to diseased pudendal arteries. Medtronic initiated a US multicenter trial of a zotarolimus eluting stent in ED.  It is expected that angioplasty stenting for ED will become common in the near future.

Analyzing the anatomy of the pudendal artery it is clear that the access will require small and flexible delivery systems and the small diameter of the artery will demand low profile stents. Also the fact that a large proportion of the pudendal artery lesions are at the point where the pudendal artery exits the pelvic floor may necessitate self expanding stents to minimize crush damage by external compression.

Palmaz Scientific has developed very low profile, vapor deposited self-expanding super-elastic stents which are indicated for small arteries with high plaque burden, exposed to compressive force.  Furthermore, our micro groove technology supporting rapid endothelialization promises to be an exciting substitute to drug eluting stents, preventing the need for drugs and polymer covers in the metal implant.

## Carotid stent

This device is essentially a larger version of SESAME. It will also be self-expanding. Carotid artery angioplasty and stenting pose a serious risk of stroke by plaque particles released from the treated site. The micromesh cover may reduce the routine use of embolic protection devices ("EPD"). Otherwise, it will add to the safety of the procedure if used in conjunction with EPD.

Preliminary animal laboratory data showed that the device performed as expected.  Completion of preclinical data and limited clinical studies are required for obtaining a CE mark to start sales in the European Union countries.  We believe that FDA approval may be attained by a prospective controlled trial comparing the results to historical data from a predicate device such as the Cordis SMART stent.

**Jefferies**

## INTELLECTUAL PROPERTY

### Patents

The Company owns 117 issued U.S. and international patents and has 109 U.S. and international patent applications pending. The patent portfolio encompasses enabling technology that covers methods of making the biomaterials used in the Company's devices and universal material properties, characteristics or features of the biomaterials. Additionally, the Company's patent portfolio covers an array of product types, including:

- Thin Film Covered Stents
- Bare Metal Stents
- Drug Delivery Devices
  Bare metal stents
  Covered stents
  Grafts
  Balloons
- Valves
  Cardiac
  Venous

- Grafts
  Peripheral
  Arterio-Venous
  CABG
- Anastomosis
- Embolic Protection Devices
- Angioplasty Balloons
- Wires, Sheaths & Delivery Systems
- Occlusion Devices
- Patches
- Cosmetic and Orthopedic Implants
- BioReactor Platforms for Cell Lines

Among the universal enabling technology, the Company enjoys issued patents covering  i) stent surface patterning for promoting endothelialization, ii) stents and implantable devices made of materials having highly controlled surface heterogeneity and methods of making implantable endoluminal devices by vacuum deposition, iii) high strength, high strain tubular nitinol films, iv) microporous metal thin films, and v) monolithic medical device structures, each of which is described in greater detail on the following pages.

The Company's IP is regarded as seminal to the core business objectives. Palmaz Scientific's IP portfolio also includes patents and patent applications covering other devices not mentioned in this memorandum, some of which is licensed, exclusively and non-exclusively, to Johnson & Johnson for which the Company may receive royalty payments in the future.  The Company places a high value on its intellectual property portfolio and aggressively files new patent applications and prosecutes both domestic and foreign patent applications for each of its patent applications. In addition to its portfolio of patents and patent applications, the Company has internally documented trade secrets, including a large number of invention disclosures which are reviewed regularly for possible filing as patent applications.

### i)      Stent Surface Patterning for Promoting Endothelialization

Patents issued in the United States, Europe, Canada, Australia and Japan directed to a stent having at least one groove on the inner surface of the stent, the groove having a shape that increases the rate of endothelial cell migration upon the inner stent surface. Figure 1 from the U.S. Patent application, reproduced below, depicts several configurations of grooves 400 on an inner surface of a stent.



*Figure 1*

**Jefferies**

The Company successfully defended an Opposition filed by Boston Scientific seeking to invalidate its European Patent No. 1028672. After a hearing before the European Patent Office's Opposition Board, the Company succeeded in validating its European Patent with amended claims over Boston Scientific's challenge. Boston Scientific has appealed the Opposition Board's decision. The Company is very pleased to announce that the patentability of the Company's European Patent No. 1028672 was again confirmed by the European Patent Office's Opposition Appeal Board on Thursday December 8, 2010. The patent covers the Company's technology pertaining to grooves in stents and the method of making the grooves in stents. In 2005, Boston Scientific Corporation filed an Opposition seeking to invalidate the patent. In 2008, after a first hearing before the European Patent Office Opposition Division, the Company's patent was validated with what the Company regards as minor claim amendments. After the first hearing, Boston Scientific Corporation filed an Appeal to the Opposition Appeal Board again seeking to invalidate the patent. The most recent decision of the Opposition Appeal Board is a final determination of the patentability of the identical patent claims previously found patentable by the Opposition Division. No further appeals are available to Boston Scientific Corporation before the European Patent Office.

### ii)    Stents and Implantable Devices: Materials with Controlled Surface  Heterogeneity and Vacuum Deposition Methods.

The Company owns issued patents in the United States, Canada, Australia and Europe for stents and radially expandable medical devices in which a luminal surface of the device has controlled heterogeneities and methods of making such stents and devices. Heterogeneities which are controlled include grain size, grain morphology, intragranular spacing, surface topography and material composition.

The scanning electron micrograph of a transverse cross-section of the Company's materials is reproduced below as Figure 2 and illustrates the high degree of homogeneity in the Company's biomaterials.



*Figure 2*

### High Strength, High Strain Tubular Nitinol Films and Methods.

High strength tubular nitinol films are covered by U.S. Patent No. 7,335,426 which covers tubular nitinol films having strengths greater than 1250 MPa and strain greater than 12. Such tubular nitinol films are well-suited for fabrication of stents, stent covers or metal surgical grafts. The Company is actively pursuing additional pending U.S. patent applications for these high strength nitinol materials, its methods of making the high strength nitinol materials as well as foreign patent applications in several countries.

### Microporous Metal Thin Films

U.S. Patent No. 6,936,066 issued with a broad claim to implantable medical devices including "a generally tubular, non-coiling body member comprising a film selected from the group consisting of metallic and pseudometallic materials and having a first surface, a second surface and a thickness intermediate the first surface and the second surface; and a plurality of microperforations passing through the thickness of the body member and communicating between the first surface and the second surface, whereby said plurality of microperforations geometrically deform to permit diametric expansion of the body member and impart compliance to the body member."

U.S. Patent No. 7,300,457 issued with claims covering a vacuum deposited microperforate metal tubular graft having a thickness less than 75 microns.

**Jefferies**



*Figure 3*

The photomicrograph reproduced above as Figure 3 illustrates an expanded shape memory microporous metal cover overlying two stent struts and a single stent hinge as covered by the referenced patents.

The photograph reproduced below as Figure 4 illustrates Palmaz Scientific's unique all metal micromesh film covering on stents of varying diameters and lengths useful for a wide variety of indications.



*Figure 4*

Patents issued in the United States and Australia and pending applications in Japan, Europe and Canada are directed to an embolic protection device, including a microperforate graft member, such as that from the '066 patent, above. The patents covering the embolic protection device include a graft member constructed of a metal material having a generally frustroconical deployed state and openings that decrease in size from the proximal end toward the distal end when the graft member is in the deployed state to capture and retain emboli and particulate matter of different sizes.

The photomicrograph below, Figure 5, illustrates the construction of the company's metal thin film covering for an embolic protection device having larger pore openings at the outer peripheral surfaces where flow rates are minimal and much smaller pore openings toward the center of the vessel where blood flow rates are maximal.

**Jefferies**



*Figure 5*

### iii)  Devices of Monolithic Construction

U.S. Patent No. 6,537,310 covers a method of making a monolithic covered stent by vacuum depositing a stent layer, then etching regions of the stent material to form struts and web regions between the struts.  Figure 6, below, taken from the '310 Patent, illustrates a resulting covered stent structure made by this process showing the stent struts 22 and the web regions 24.



*Figure 6*

Covered stent devices having structural elements made of multi-layered monolithic materials, such as that illustrated below in Figure 7, are also covered in U.S. Patent No. 6,849,085.

**Jefferies**



*Figure 7*

## HISTORY

Palmaz Scientific traces its history to 1988, with Dr. Palmaz's development of the first commercially successful cardiovascular stent, Palmaz® Stent, approved by the FDA for use in coronary arteries in 1994 and later sold to Johnson & Johnson.  More than two decades later, the stent has been established as one of the most successful medical devices in medical history with over 1 million patients each year undergoing a stent procedure in the US and generating approximately US$5 Billion in worldwide revenue annually from all varieties of stents.



A. Insertion by catheter

B. Balloon Expansion

C. Stented Vessel

**1999**

A decade after its development with the breakthrough Palmaz® Stent established as one of the most successful medical devices of the time, Dr. Palmaz partnered with Christopher Banas, an experienced executive and engineer in the chemical, microelectronics and medical device industries, to form Advanced Bio Prosthetic Surfaces Ltd. ("ABPS"). ABPS recruited leading scientists, engineers and technologists with expertise in metallurgy, high-vacuum physical and chemical vapor deposition and molecular and cellular biology to develop advanced biomaterials for implantable medical devices.

**2002**

In 2002 ABPS developed a Saphenous Vein Graft ("SVG") stent in partnership with the Cordis subsidiary of Johnson & Johnson and was awarded its first patent for nanotechnology. Cordis, a Johnson & Johnson company subsequently licensed the technology from ABPS and began clinical trials in 2003.

**Jefferies**



**Sizes**

Diameter: 4.1 mm
          4.8 mm
          5.8 mm

Cover Thickness <5 micron

**2003**

Advanced Bio Prosthetic Surfaces signs agreement to exclusively license its core technology to Johnson & Johnson. ABPS continues to hold the patents for the technology.

**2006**

Dr. Julio Palmaz was inducted into the National Inventor's Hall of Fame for the invention of the balloon-expandable stent.  Since the launch of the first coronary stent in 1994, balloon angioplasty was quickly replaced as the standard of care.

**2008**

In early 2008, Dr. Palmaz, Steve Solomon, Christopher Banas, Phil Romano and other principals of ABPS, along with private investors, formed Palmaz Scientific to reacquire the technology license for thin-film and related intellectual property, equipment, employees and related assets from Nitinol Development Corp. ("NDC"), a Johnson & Johnson / Cordis company which had licensed ABPS technology in 2003.

**2009**

Palmaz Scientific files CE Mark application for SESAME Stent in May 2009.

Micro Stent and Micro-Groove programs launched.

Johnson & Johnson converts debt to Series A-2 preferred stock.



Micro-Stent



Rendering of Micro Grooves

**2010**

Texas Emerging Technology Fund awards the Company $3 million to advance its technologies.

Dr. Palmaz is honored by the Cardiovascular Research Foundation at the Pulse of the City Gala for his innovations in interventional cardiovascular medicine.

## COMMERCIALIZATION STRATEGY

The Company's strategy is to commercialize the Palmaz Nanotechnology Platform through the introduction of products, third party licensing, joint ventures and/or other strategic partnerships. The commercialization effort will be supported by brand awareness campaigns, an engaged scientific advisory board, patent expansion and protection, and collaborative relationships with leading medical institutions of higher education.

The Company's extensive intellectual property portfolio has many potential medical device applications in several billion dollar plus markets.  To commercialize more applications more quickly, the Company will seek out third parties to license the technology to these third parties in return for royalties. We expect that a focus on a licensing strategy will yield a consistent and recurring royalty revenue flow that may become a primary revenue source to the Company.  Additional opportunities with third parties would be to fund development or enter into joint ventures.

**Jefferies**

**Additional Potential Indications for Our Products**

In addition to the indications previously described, the following represents additional potential indications for our products.

*Peripheral stent*

Including lower and upper extremity vessels, renal dialysis access, brachio-cephalic, visceral and venous stents, peripheral bare metal stents (PBMS) technology has remained focused on handling characteristics and fracture resistance. The poor performance of current femoral, below-the-knee and dialysis access stents can be improved by focusing on improving healing rates by surface patterning. The superior metallurgy technology produced by PVD manufacturing will optimize the unique performance requirements of peripheral stents.

*Renal stent*

This will be a balloon-expandable covered stent. It will differ from existing devices in the material properties. The frame will be stainless steel or cobalt chromium alloy in martensitic form (malleable) such as in conventional renal stents. The micromesh will be as in the devices described above. Renal stenting has been suspect of microembolization causing silent, irreversible loss of renal function. EPD's are often not effective in the renal arteries because the short length of these arteries and the frequency of multiple branching negates the possibility of a safe anchor of the filter. Therefore we believe a pre-emptive embolic approach such as offered by this device is likely to become standard of use.

*Orthopedic Implants*

By free forming of thin metal, inflatable intramedullary rods, vertebral and intervertebral inserts and a large variety of orthopedic implants can be placed by minimally-invasive surgery. The approach would be based on introducing a composite, hollow and inflatable device by a small opening and guided by X-ray fluoroscopy. A typical application would be a long bone fracture, such as the humeral bone (forearm) in a patient with debilitating disease such as terminal cancer, precluding surgical correction. Once in place the device would be inflated by a fluid polymer that would set in a solid state after minutes. The end result would be comparable to placing a solid intramedullary rod but with decreased invasiveness.

Intravertebral body implant placement known as vertebroplasty can be optimized by using an approach such as described above. Conceivably, the polymer could be rigid in vertebral body inserts and elastic when used as vertebral disks replacement. These are examples of potential applications of inserts by minimally invasive techniques. Other applications in this field are possible.

*Plastic and Reconstructive Surgery*

Implantable breast, buttocks, shoulder, facial and other implants could be made by composite fabrication involving a plastic inner core and a thin metal film surface. Again this surface can be micro or nanotexturized to enhance healing properties. The inserts can be made solid for conventional surgical application or inflatable for minimally-invasive applications. The use of implants with the surface described would prevent the known undesirable tissue response, such as fibrotic capsule and calcification sometimes developing around current polymeric implants.

**Brand Awareness**

Our brand awareness and support of our technology and products is expected to be executed through close collaboration with key opinion leaders in the worldwide medical community. In addition to our management thought leadership and existing industry relationships with Cordis and J&J as well as the University of Texas Health Science Center at San Antonio, we expect to forge new strategic relationships with industry leaders. The Company has appointed an advisory board of leading medical, clinical and industry professionals and academic experts who will further support the Company on its medical, clinical, industry, and strategic direction.

## OPERATIONS

### Legal Structure

Palmaz Scientific Inc., a Delaware Corporation, formed February 12, 2008

Subsidiaries:   Advanced Bio Prosthetic Surfaces Ltd (100% Owned)

ABPS Management LLC (100% Owned)

ABPS Venture One Ltd. (80% Owned)

### Locations

Headquarters: Dallas, Texas

Operations:  Fremont, California

Research Affiliation:  University of Texas Health Science Center at San Antonio ("UTHSCSA").  The Company and members of its management team have a long relationship with the UTHSCSA. UTHSCSA maintains a bio prosthetic lab that the Company uses.

## MANAGEMENT & BOARD

The Palmaz Scientific management and board of directors come from diverse backgrounds and have extensive management expertise, and the combined team has created shareholder value in excess of $1 billion from sale transactions involving startup companies.  Below are the biographies of the individuals expected to serve as the management team and the board of directors.



**Julio Palmaz, Chairman of the Board of Directors and Chief Scientist.**

Dr. Palmaz currently holds the Ashbel Smith Professorship as a tenured Professor at the University of Texas Health Science Center at San Antonio. He is the founder of Advanced Bio Prosthetic Surfaces, an R&D company devoted to advanced device concepts, which licensed certain of its intellectual property to J&J/Cordis in 2003 and was combined with the Company in 2008. He also founded Palmaz Vineyards in 1997, an advanced winemaking operation based on underground gravity flow processing and the largest underground winemaking facility in the US. He received his M.D. degree in 1971 at the National University of La Plata, Argentina, and completed his radiology specialty training at the University of California, Davis in 1980.

Dr. Palmaz began his professional career in 1974 at San Martin University Hospital, Argentina, and was chief of special procedures at Martinez Veterans Administration hospital in 1981. In 1983, Dr. Palmaz joined the University of Texas Health Science Center at San Antonio, Department of Radiology as Chief of Angiography and Special Procedures until 1999, and as Chief of Cardiovascular and Interventional Radiology Research until 2005. He is the inventor of the Palmaz® Stent, and was a principal in EGP, a partnership that held the licensing rights to the Palmaz–Schatz Coronary Stent, that was purchased by J&J. It is recognized as one of the most successful medical devices of its time and is considered one of the patents that changed the world. Dr. Palmaz has 20 issued patents and is the author of 29 books or book chapters and has authored 104 peer  reviewed publications. He is a 2007 Gold Medalist of the Society of Interventional Radiology, 2006 inductee of the National Inventors Hall of Fame, a 2005 Distinguished Scientist of the American Heart Association and fellow of the American Institute of Medical and Biological Engineering. For two years in a row, his patent on the balloon  expandable stent was recognized as one of the "Ten patents that changed the world" published in Intellectual Property International magazine, August 2002. His early stent research artifacts are now part of the medical collection of the Smithsonian Institution in Washington, DC and the Texas History Museum in Austin, TX.

In January 2003 Palmaz received the Presidential Distinguished Scholar Award from the University of Texas San Antonio. He received the title of "Master of Interventional Cardiology" from the Argentina College of Cardiology, and "Extraordinary Professor" from the National University of La Plata, Argentina. He received honorary titles or awards from the American Heart Association, International Society of Endovascular Surgery, the Society of Interventional Radiology, the German Roentgen Society, The Rotterdam Thoraxcenter in Holland, the Washington Cardiovascular Research Foundation, the Society of Cardiac Angiography, the Texas Heart Institute, the State Bar of Texas, the Miami Cardiac and Vascular Institute, the Cardiovascular Institute of the South, and the Surfaces in Biomaterials Foundation.

### Selected articles:

- PALMAZ JC. The intravascular stent during the last and the next 10 years. J Endovasc Ther 2004; (suppl II) II 200- II 206.
- PALMAZ JC, S Bailey, D Marton, E Sprague. Influence of stent design and material composition on procedure outcome. J Vasc Surg 2002; 36:1031-9.

- Parodi JC, PALMAZ JC, Barone HD:  Transfemoral Intraluminal Graft Implantation for Abdominal Aortic Aneurysms.  Ann Vasc Surg 5:491-499, 1991.
- Schatz RA, PALMAZ JC, Garcia F, Tio FO.  Balloon Expandable Intracoronary Stents in the Adult Dog.  Circulation 76:450 457, 1987.
- PALMAZ JC, Kopp D, Hayashi H, Schatz RA, Hunter G, Tio FO, Garcia O, Alvarado R, Rees C, Thomas SC.  Experimental Balloon Expandable Intraluminal Stenting of Normal and Abnormal Renal Arteries. Radiology 164:705 708, 1987.
- PALMAZ JC, Sibbitt RR, Reuter SR, Garcia F, Tio FO:  Expandable Intrahepatic Portocaval Shunt Stents: Early Experience in the Dog.  AJR 145:821 825, 1985.



**Philip J. Romano, Director.**

Philip J. Romano is an investor, entrepreneur, artist and nationally  renowned restaurateur. Involved in the restaurant business for over forty years, in the course of his career, he has created over twenty–five concepts. Mr. Romano has created several national restaurant concepts including Fuddruckers, Romano's Macaroni Grill, Spageddies, Cozymel's, Rudy's Country Store and BBQ and eatZi's Market & Bakery. The restaurant concepts created by Mr. Romano produce over $1 billion in sales each year and to date, his concepts have generated more than $10 billion in revenue.

Mr. Romano was a principal in EGP, a partnership that held the licensing rights to the Palmaz-Schatz Stent that was purchased by J&J. Mr. Romano also served on the Board of Directors and was an investor in CardioSpectra, a medical device company sold to Volcano Corporation (NASDAQ: VOLC). Mr. Romano was also founder and partner of the American Institute of Gastric Banding, a developer of outpatient bariatric surgery centers and co-founded Scientific Health Development, a fund that is an early stage investor in medical device, nutraceutical and pharmaceutical companies. Mr. Romano has written a book entitled "Food for Thought" published by Dearborn in 2005 that made the CEO Best Sellers List.

From 1989 through 2002, Mr. Romano served as a consultant and joint venture partner of Brinker International, Inc. (NYSE: EAT) as national operator, developer and franchisor of numerous restaurant concepts, including Chili's Grill & Bar and Romano's Macaroni Grill. Mr. Romano currently owns and operates the following restaurant concepts: eatZi's Market & Bakery, Nick & Sam's Steak & Fish House, Who's Who Burgers and Coal Vines Pizza. Romano and his family have established a charitable foundation, The Food Foundation, which operates as Hunger Busters, and provides food to the hungry and has a mission of bringing a fresh meal with compassion to every hungry citizen of Dallas, Texas.

Mr. Romano currently serves on the Board of the Cox School of Business at Southern Methodist University. He lectures frequently at universities, national business seminars, civic organizations and special interest group meetings.



**Steven B. Solomon, CEO and Director.**

Steven B. Solomon currently serves as the Chief Executive Officer and a Director of Palmaz Scientific, Inc.  Mr. Solomon has served in executive and director roles with public and private companies for more than 20 years, with substantial experience in public and private equity and debt financings, mergers and acquisitions, restructurings and executive management.

Mr. Solomon served as the Chief Executive Officer, President and Chairman of the Board of Directors of Citadel Security Software Inc. since its formation in December 1996 until its sale in December 2006 to McAfee, Inc. (NYSE: MFE). Mr. Solomon also served as Director, President and Chief Executive Officer of CT Holdings Enterprises, Inc. until the company's merger with Xcorporeal Inc. Mr. Solomon was the founder and served as Chairman of the Board and Chief Executive Officer and director of Parago, Inc., an incubation venture of CT Holdings that is an application service provider and internet-based business process outsourcer that provides an on-line suite of promotional offerings designed to automate promotional management and optimize the customer care services offered by its clients. Mr. Solomon led Parago in completing approximately $85 million in angel and venture financings and three acquisitions. From 2000 to 2006, Mr. Solomon also served as a Director of River Logic, Inc., an incubation venture of CT Holdings that creates and operates integrated networks of decision support tools, elearning solutions and ecommerce capabilities designed to enable decision makers to leverage knowledge and information to gain a competitive advantage.

Mr. Solomon has served on the Board of Directors of Boo-Koo Holdings and the Cyber Security Industry Alliance ("CSIA"), where he testified before a congressional oversight hearing on "Information Security—Vulnerability Management Strategies and Technology", providing an industry perspective on cybersecurity legislation and the importance of protecting our national infrastructure. Mr. Solomon is also active in the Young Presidents Organization ("YPO") of North Texas.

**Jefferies**

**Christopher Banas, Director.**

Christopher E. Banas has over 30 years experience in the chemical, microelectronics and medical device industries, where he has held various engineering and executive management positions at C.R. Bard, Inc, Guidant/ACS, Inc and W.L. Gore, Inc. Mr. Banas began his career as a polymer chemist at the Roy C. Ingersoll Research Center/Borg Warner Chemicals. Mr. Banas is currently the President and General Manager of the OCT division of Volcano Corporation. Mr. Banas held the position of Chairman and CEO of CardioSpectra, Inc, a medical device diagnostic company that was acquired by Volcano Corp. (Nasdaq: VOLC).

Mr. Banas co–founded ABPS and was President and CEO in 2003 when ABPS entered into an exclusive license agreement with Cordis. In addition to his engineering, executive management and business development experience, Mr. Banas holds 31 US patents in the fields of cardiovascular medicine, nanotechnology and thin film deposition of Nitinol.

Intellectual property portfolios developed by Mr. Banas have resulted in two acquisitions and one exclusive licensing arrangement. He has developed intellectual property programs and coordinated technology transfers from both academic and industry institutions, carrying out extensive due diligence on behalf of both buyers and sellers.

Being highly respected and well connected in the elite biomedical device community has allowed Mr. Banas to connect with the top medical specialists, academic researchers, intellectual property experts and investors in the biomedical industry. In addition to his successful business development ventures, Mr. Banas also sits on the Board of Directors for Resonetics Inc, an excimer laser company supporting the medical device and electronics industry and has an active consulting business, CB Technology Ventures where he provides services to companies like Elliot and Associates, a Wall Street hedge fund.

Mr. Banas has authored book chapters and technical papers and has spoken at the International Conference on Shape Memory and Superelastic Technologies ("SMST"), NanoBioTech and Nano Summit.



**Richard Connelly, Chief Financial Officer.**

Richard Connelly is a financial executive with 35 years of financial management and operations experience at such companies as Texas Instruments (1980-1985), Sterling Software (1987–1997), Citadel Security Software (2001-2006) and Riptide Worldwide Inc. (2007-2008) where he held various financial management positions including Controller, Treasurer and/or CFO. In addition to these public companies, Mr. Connelly has been CFO of several technology start-up companies including Photomatrix Corporation (1985-1986), Answersoft Inc. (1997-1998), JusticeLink Inc. (1998-1999) and Asset-Intertech Inc. (1999-2000).  He began his career as an auditor in the Chicago office of Ernst & Young (1974-1979). He holds a masters degree in finance from the University of Texas at Dallas (1988) and a bachelor degree in accountancy from the University of Illinois (1974). He is a Certified Public Accountant in Texas.

## SCIENTIFIC ADVISORY BOARD

The Company's Scientific Advisory Board of leading medical, clinical and industry professionals and academic experts will advise the Company on medical, clinical, industry and strategic direction. The initial members of the Scientific Advisory Board are listed below. Additional members will be added to the Scientific Advisory Board in the future.

**Renu Virmani, MD.**

Dr. Renu Virmani currently serves as Medical Director, CVPath, International Registry of Pathology in Gaithersburg, MD. She is recognized as one of the leaders in the search for diagnostic and treatment therapies for Vulnerable Plaque. Dr. Virmani is also Clinical Professor, Department of Pathology at: Georgetown University; University of Maryland-Baltimore; Uniform University of Health Sciences; and Vanderbilt University.

**Steven R. Bailey, MD.**

Steven R. Bailey, M.D., is professor of medicine and radiology in the School of Medicine at the University of Texas Health Science Center at San Antonio, where he is also chief of the Janey and Dolph Briscoe Division of Cardiology, and currently serves as president of the Society for Cardiovascular Angiography and Interventions.

**Mark Jenkins, MD.**

Mark Jenkins, MD. Is an interventional cardiologist in Dallas, Texas; he was previously a fellow at Johns Hopkins School of Medicine where he conducted research on the stent program.

**Barry T. Katzen, MD.**

Barry Katzen, M.D., is founder and medical director of Baptist Cardiac & Vascular Institute, Miami, Florida, a fellow in the American College of Cardiology, the American College of Radiology and the Society of Cardiovascular and Interventional Radiology, of which he is past president, and is also a clinical professor of radiology at the University of Miami School of Medicine.

**Peter Fitzgerald, MD.**

Peter Fitzgerald, MD., is Director of the Center for Cardiovascular Technology and Director of the Cardiovascular Core Analysis Laboratory at Stanford University Medical School. He is an Interventional Cardiologist and has a PhD in Engineering. He is Professor in both the Departments of Medicine and Engineering at Stanford.

**Robert Bersin, MD.**

Robert Bersin, MD., is Director of endovascular services, Seattle Cardiology. Seattle, Washington. Fellow, American College of Cardiology. Fellow, American College of Physicians, American Society for Cardiac Interventionists. Member, International Society for Endovascular Surgery.

**Frank J. Criado, MD.**

Frank J. Criado, MD., is a board-certified vascular surgeon. He is a founding member and current secretary of the International Society of Endovascular Specialists ("ISES"), a fellow of the American College of Surgeons ("FACS"), and a member of all major U.S. and international vascular societies. Dr. Criado is a Vascular Surgeon and Interventionalist at Union Memorial Hospital in Baltimore, Maryland where he established the endovascular program in 1988.

**Jose Antonio Condado, MD.**

Jose Antonio Condado, MD., is a doctor of cardiology at Trinity Medical Center, Caracas, Venezuela.

**Robert S. Schwartz, MD.**

Robert S. Schwartz, MD., is a Professor of Medicine at University of Minnesota Medical School, Medical Director at the Minnesota Cardiovascular Research Institute, and Cardiologist at the Minneapolis Heart Institute. His clinical and research interests include interventional cardiology, imaging, clinical information processing and clinical medical care.

**Jefferies**

## Ownership

Palmaz Scientific is seeking to raise approximately $20 million in gross cash proceeds of Series B Convertible Preferred Stock.  The shares are being offered only to accredited investors and will not be registered.  Subscriptions will only be made upon acceptance by the Company of a completed subscription agreement. See the attached "Subscription Agreement" for the details and the requirements of the offering.  See the section of this Memorandum entitled "Risk Factors" for a description of certain risks related to the offering. We anticipate that we will need to raise additional funds in the future.

| EQUITY CAPITALIZATION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Shares | | | | % Ownership | |
| OWNERSHIP | | Common | Preferred[1] | Warrants | Convertible Notes | Total "As If" Converted | Pre Offering | Post Offering |
| Julio Palmaz & Affiliates | CS & Note | 6,740,607 | | | 676,232 [2] | 7,416,839 | 31.23% | 23.36% |
| Philip Romano & Affiliates | CS & Note | 2,734,261 | | | 198,126 [2] | 2,932,387 | 12.35% | 9.24% |
| Chris Banas | CS & Note | 1,303,694 | | | 115,390 [2] | 1,419,084 | 5.97% | 4.47% |
| Steve Solomon | CS | 2,250,000 | | | | 2,250,000 | 9.47% | 7.09% |
| Johnson & Johnson Company[3] | A-2 | | 1,344 | 200,000 | | 1,544,206 | 6.50% | 4.86% |
| Texas Emerging Technology Fund | B | | 14,999 | | | 1,499,900 | 6.31% | 4.72% |
| John B Foster | A | | 858,369 | | | 858,369 | 3.61% | 2.70% |
| Senior Management | CS | 250,000 | | | | 250,000 | 1.05% | 0.79% |
| Eugene Sprague | CS | 826,437 | | | | 826,437 | 3.48% | 2.60% |
| Steve Bailey | CS | 623,652 | | | | 623,652 | 2.63% | 1.96% |
| All other investors as a group | | 950,298 | 2,039,627 | 590,000 | 120,000 [5] | 4,131,925 | 17.40% | 13.01% |
| **Fully Diluted Shares September 30, 2011** [6] | | **15,678,949** | **2,914,339** | **790,000** | **1,109,748** | **23,752,799** | **100.00%** | **74.81%** |
| **Series B Shares** [7] | Issued | | **80,000** | | | **8,000,000** | | **25.19%** |
| **Fully Diluted Shares Post Offering** | | **15,678,949** | **2,994,339** | **790,000** | **1,109,748** | **31,752,799** | | **100.00%** |

(1) Preferred shares convert into Common shares at 1 for 1 for Series A, 10 for 1 for Series A-1 and at 1000 for 1 for series A-2

(2) Convertible notes convert at $2.33 per share into Series A Preferred Stock

(3) Includes $3,132,000 note principal balance plus $504,000 of accrued interest exchanged for 1,344.206 Series A2 shares
   plus 200,000 warrants exercisable at $2.33 per share.

(4) $3 Million State of Texas Emerging Technology Fund Award converted March 31, 2011 into 14,999 Series B shares

(5) Convertible notes convert at $2.50 per share

(6) Options for employees, officers and advisors are not included.  Options plan not yet adopted. No options outstanding.

(7) Series B Preferred convert into Common shares at 100 for 1.  Approximately $20M may be raised, including shares sold to date.
   Certificate of Designation for 120,000 Series B Shares on file.

At June 30, 2011, there were 50,000,000 shares of authorized common stock ($0.001 par value) and there were 10,000,000 shares of authorized preferred stock ($0.001 par value).

**Jefferies**

## Notice to Investors

The Series B Shares are suitable for those investors whose business and investment experience, either alone or together with an experienced advisor, makes them capable of evaluating the merits and risks of their prospective investment and who can afford the loss of their entire investment and have no need for liquidity in their investment. See the "RISK FACTORS" section of this Memorandum.

The Series B Shares are being offered and will be issued in reliance on certain exemptions from registration and qualification, which are available under federal and state securities laws for non-public offerings. The Company intends to rely upon the exemption for non-public offerings provided by Rule 506 of Regulation D promulgated under the Securities Act as well as appropriate exemptions under state securities law and regulations to offer and sell the Securities solely to Accredited Investors as defined in Regulation D.

**PRIOR TO ACCEPTANCE OF ANY SUBSCRIPTION BY THE COMPANY, EACH INVESTOR MUST REPRESENT IN WRITING TO THE COMPANY, BY COMPLETING AND SIGNING A SUBSCRIPTION AGREEMENT AND INVESTMENT QUESTIONNAIRE, THAT HE OR SHE SATISFIES, AT A MINIMUM, THE FOLLOWING REQUIREMENTS:**

- The purchaser is 18 years of age or older or that a bona fide trust has been set up if he or she is a minor.
- The purchaser understands that he or she must bear the economic risk of the investment for an indefinite period of time because there is not and might not ever be a public market for the Series B Shares and the resale of the Securities has not been registered.
- The purchaser understands that the Securities will not be transferable under federal and state securities laws except under limited circumstances.
- The purchaser is acquiring the Securities for his or her own account for investment with no present intention of dividing his or her interest with others or of reselling or otherwise disposing of all or any portion of the same.
- The purchaser has received, read carefully and is familiar with this Memorandum, and the Company has, during the course of the Offering and prior to the sale of the Series B Shares, accorded the purchasers and their representative, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of this Offering and to obtain any additional information necessary to verify the accuracy of the information contained in this Memorandum.
- The purchaser understands the speculative nature of their investment, has no need for liquidity with respect thereto, and is able to sustain a complete loss of his or her investment.
- The purchaser meets certain standards involving his or her minimum net worth and annual income relating to his or her ability to be considered an Accredited Investor regarding this Offering. The purchaser has such knowledge and experience in finance, securities, investments and other business matters so as to be able to protect his or her interests in connection with his or her investment in the Series B Shares.
- The purchaser is not a member of FINRA or any other self-regulatory agency that would require prior approval of a purchase of the Series B Shares.

**A PROSPECTIVE PURCHASER MUST RELY ON HIMSELF OR HERSELF OR HIS OR HER PROFESSIONAL ADVISOR TO DETERMINE IF THE SERIES B SHARES ARE A SUITABLE INVESTMENT. THIS MEMORANDUM SHALL NOT CONSTITUTE AN OFFER TO SELL TO, OR A SOLICITATION OF AN OFFER TO BUY FROM, ANY PERSON WHO DOES NOT MEET THE SUITABILITY STANDARDS SET FORTH ABOVE AND IN THE SUBSCRIPTION AGREEMENT.**

Jefferies

## Risk Factors

*You should carefully consider the following information about risks relating to our business and this offering, together with the other information contained in this Memorandum, before making an investment in our securities. If any of the circumstances or events described below actually arises or occurs, our business, results of operations, cash flows and financial condition could be harmed. In any such case, the value of our securities may decline and you may lose all or part of your investment.*

- **Our success will depend on our ability to raise additional funds to operate our business.** We expect to incur losses for the foreseeable future and we will require substantial amounts of additional financing in order to satisfy our capital requirements. In particular, we may require additional capital in order to continue to conduct the research and development and obtain regulatory clearances and approvals necessary to bring any future products to market and to establish effective marketing and sales capabilities for future products.  Additional funds may not be available or, if available, may not be on attractive terms and may result in substantial dilution to your investment. The inability or unwillingness of other investors to make investments in the Company could have a substantial negative effect on the Company or cause you to lose all of your investment. Changes in operating plans, lower than anticipated sales, increased expenses or other events, including those described in these Risk Factors, may cause us to require additional debt or equity financing. Financing may not be available on acceptable terms, or at all, and our failure to raise capital when needed could negatively impact our growth and other plans as well as our financial condition and results of operations. Additional equity financing may be dilutive to the holders of our shares and debt financing, if available, may involve significant cash payment obligations and covenants and/or financial ratios that restrict our ability to operate our business.

- **If we lose the services of Julio Palmaz or any of our key management personnel, our business would suffer.** Our future success will significantly depend on the continued services and performance of Julio Palmaz and our senior management team. Future performance will depend on our ability to motivate and retain these and other key team members. Competition for these employees is intense. The loss of the services of members of our senior management or key team members or the inability to attract additional qualified personnel as needed could materially harm our business. Our board and management will have exclusive responsibility for the Company's activities, and other shareholders will have limited ability to make decisions in the management of the Company. The success of the Company will depend in great part upon the ability of its management to successfully implement its business plans. No assurance can be given that the Company will be able to attract and retain the qualified personnel necessary for success.

- **We will be subject to control by a limited number of shareholders.** Control of our business and affairs will be vested largely in our board of directors and a limited number of shareholders, including members of our board of directors and senior management. These persons control a majority of the voting power of our common stock and may effect corporate transactions even if our other shareholders are opposed to such transactions.

- **Completion of this offering is not subject to us raising a minimum offering amount and therefore proceeds may be insufficient to meet our objectives, thereby increasing the risk to investors in this offering.** Completion of this offering is not subject to us raising a minimum offering amount, and we may close upon receipt of any subscriptions we receive.  As such, proceeds from this offering may not be sufficient to meet our objectives and other corporate milestones that we may set. Once you subscribe, you may not revoke the subscription and cancel the purchase of the Series B Shares in the offering. Investors should not rely on the success of this offering to address our need for funding.

- **We lack operating history.** The Company is a recently organized entity with a limited history of operations or earnings and limited experience operating a stand-alone business. There is no assurance that the operations of the Company will be profitable or that any investment in the shares will be recouped.

- **There are restrictions on the resale of shares and there is no liquidity for the shares.** Each subscriber will be required to represent that the subscriber is purchasing the shares for the subscriber's own account, for investment only and not with a view to the sale or distribution thereof. The shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), the securities laws of any state thereof, or the securities laws of any other jurisdiction. Therefore, the shares cannot be resold unless they are registered under the Securities Act and other applicable securities laws or an exemption from registration is available. There can be no assurance that registration of the shares under the Securities Act or other securities laws will ever be effected. There is no public market for the shares and one is not expected to develop. Shareholders must be prepared to bear the risks of owning the shares for an extended period of time.

- **The Company has not implemented significant corporate governance measures, in the absence of which, investors may have limited protections against conflicts of interest and similar matters.** Recent federal legislation, including the

**Jefferies**

Sarbanes-Oxley Act of 2002, has resulted in the adoption of various corporate governance measures designed to promote the integrity of the corporate management and the securities markets. Some of these measures have been adopted in response to legal requirements. Others have been adopted by companies in response to the requirements of national securities exchanges. Among the corporate governance measures that are required under the rules of national securities exchanges are those that address board of directors' independence, audit committee oversight, and the adoption of a code of ethics. Since the Company's securities are not listed on a national securities exchange, it is not required to adopt, and has not adopted, any such governance measures. Investors must bear in mind the Company's current corporate governance measures in formulating their investment decisions.

■ **If our products are alleged to be harmful, we may not be able to sell them, we may be subject to product liability claims not covered by insurance and our reputation could be damaged.** The nature of our business will expose us to potential liability risks inherent in the testing, manufacturing and marketing of medical devices and biotechnology products. Using our devices in clinical trials may expose us to product liability claims. These risks will expand with respect to devices, if any, that receive regulatory approval for commercial sale. In addition, some of the products we manufacture and sell are designed to be implanted in the human body for varying periods of time. Even if a device were approved for commercial use by an appropriate governmental agency, there can be no assurance that users will not claim that effects other than those intended may have resulted from our products. Component failures, manufacturing flaws, quality system failures, design defects, inadequate disclosure of product-related risks or product-related information or other safety issues with respect to these or other products we manufacture or sell could result in an unsafe condition or injury to, or death of, a patient.

As a result of allegations that any of our products are harmful, we may experience reduced consumer demand for our products or our products may be recalled from the market. In addition, we may be forced to defend individual or class action lawsuits and, if unsuccessful, to pay a substantial amount in damages. A recall of some of our products could result in exposure to additional product liability claims, lost sales and significant expense to perform the recall. The outcome of litigation, particularly class action lawsuits, is difficult to assess or quantify. Plaintiffs in these types of lawsuits often seek recovery of very large or indeterminate amounts, including not only actual damages, but also punitive damages. The magnitude of the potential loss relating to these types of lawsuits may remain unknown for substantial periods of time. In addition, the cost to defend against any such litigation may be significant.

We do not have insurance covering our costs and losses as a result of any recall of products or devices incorporating our technologies whether such recall is instituted by a device manufacturer or us as required by a regulatory agency. Insurance to cover costs and losses associated with product recalls is expensive. If we seek insurance covering product recalls in the future it may not be available on acceptable terms. Even if obtained, insurance may not fully protect us against potential liability or cover our losses. Some manufacturers that suffered such claims in the past have been forced to cease operations or even to declare bankruptcy.

We will seek to obtain insurance covering product liability. However, even if we are able to obtain such insurance, it may not fully protect us from potential product liability claims. If a product liability claim or a series of claims is brought against us in excess of our insurance coverage, our business could suffer. Some manufacturers that suffered such claims in the past have been forced to cease operations or even to declare bankruptcy.

■ **Our success depends on the successful commercialization of our technology.** The successful commercialization of our technology is crucial for our success. Successful product development in our industry is highly uncertain and very few research and development projects produce a commercial product. Medical devices and surgical implants utilizing our technology are in very early stages of clinical development and face a variety of risks and uncertainties. Principally, these risks include the following:

future clinical trial results may show that some or all of our technology, or the technology of our strategic collaborators that might incorporate our technology, is not safe or effective;

even if our technology is shown to be safe and effective, we and our strategic collaborators may face significant or unforeseen difficulties in manufacturing our medical devices or the medical devices and surgical implants that use our technology. These difficulties may become apparent when we or our strategic collaborators manufacture the medical devices or surgical implants on a small scale for clinical trials and regulatory approval or may only become apparent when scaling-up the manufacturing to commercial scale;

even if our technology-based products are successfully developed, receive all necessary regulatory approvals and are commercially produced, there is no guarantee that there will be market acceptance of them or that they will not cause unanticipated side effects in patients. For example, if stents are found to cause, or are perceived to be the cause of, blood clots in patients, then sales of our stent products may be adversely affected. In addition, there is no guarantee that there will be market acceptance of our products. Our ability to achieve market acceptance for any of our products will depend on a number of factors, including whether or not competitors may develop technologies which are superior to or less costly

**Jefferies**

than our technology-based products, and whether governmental and private third-party payers provide adequate coverage and reimbursement for our products, with the result that our technology-based products, even if they are successfully developed, manufactured and approved, may not generate significant revenues.

If we are unsuccessful in dealing with any of these risks, or if we are unable to successfully commercialize our technology for some other reason, it would likely seriously harm our ability to generate revenue.

■ **We will depend on strategic collaborators for the development, regulatory approval, testing, manufacturing and the potential commercialization of our products.** Our strategy will be to enter into arrangements with corporate and academic collaborators, licensors, licensees and others for the research, development, clinical testing, regulatory approval, manufacturing, marketing and commercialization of our product candidates. Strategic collaborators that we may collaborate with in the future, are or may be essential to the development of our technology and potential revenue and we may have little control over or access to information regarding our collaborators' activities with respect to our products.

Our strategic collaborators may fail to successfully develop or commercialize our technology to which they have rights for a number of reasons, including:

failure of a strategic collaborator to continue, or delays in, its funding, research, development and commercialization activities;

the pursuit or development by a strategic collaborator of alternative technologies, either on its own or with others, including our competitors, as a means for developing treatments for the diseases targeted by our programs;

the preclusion of a strategic collaborator from developing or commercializing any product, through, for example, litigation or other legal action; and

the failure of a strategic collaborator to make required milestone payments, meet contractual milestone obligations or exercise options which may result in our terminating applicable licensing arrangements.

We expect that we will enter into licensing agreements with third parties to give us access to technologies that we may use to develop products through our strategic collaboration and partnership arrangements. The technologies governed by these license agreements may be critical to our ability to maintain our competitive advantage in our existing products and to develop future products.

Pursuant to terms of license agreements, if we are able to enter into any, the licensors may have the ability under certain specified circumstances to terminate the license. Events which may allow licensors to exercise these termination provisions will likely include our bankruptcy, sub-licensing without the licensor's consent, a transaction which results in our change of control, failure to use the required level of diligence efforts to develop, market and sell products based on the licensed technology, our inability to maintain adequate levels of insurance with respect to the licensed technologies or other acts or omissions that may constitute a breach by us of our license agreement. In addition, any failure to continue to have access to these technologies may materially affect the benefits that we expect to derive from the collaboration and partnership arrangements and negatively impact our results and operations.

We may utilize others to manufacture products that use our technology, and we may contract with third party manufacturers to produce commercial quantities of our potential products but we do not know whether satisfactory arrangements will be reached with such parties. If we are not able to reach such an arrangement, the commercialization of our products could be delayed. If third parties cannot deliver commercial quantities of our products in a timely manner, our revenues could be significantly reduced.

We also may elect to perform manufacturing operations internally. Developing additional commercial scale manufacturing facilities would require raising substantial additional funds and hiring and retaining additional management and technical personnel who have the necessary manufacturing experience. We can give no assurance that we will be successful in developing commercial scale manufacturing facilities or obtaining necessary approvals in a timely manner or at all.

■ **If our process related to product development does not result in approved and commercially successful products, our business could be adversely affected.** We focus our research and development activities on areas in which we believe that we have particular strengths. The outcome of any development program is highly uncertain, notwithstanding how promising a particular program may seem. Even if we are successful in preclinical and early stage clinical trials, this may not necessarily translate into success in large scale clinical trials. Further, to be successful in clinical trials, increased investment will be necessary, which we may not be able to obtain, and which will adversely affect our short-term profitability.

In addition, we will need to obtain and maintain regulatory approval in order to market new products. Notwithstanding the outcome of clinical trials for new products, regulatory approval may not be achieved. The results of clinical trials are susceptible to varying interpretations that may delay, limit or prevent approval or result in the need for post-marketing studies. In addition, changes in regulatory policy for product approval during the period of product development and review by

**Jefferies**

regulators of a new application may cause delays or rejection. Even if we receive regulatory approval, this approval may include limitations on the indications for which we can market the product. There is no guarantee that we will be able to satisfy the needed regulatory requirements, and we may suffer a significant variation from planned revenue as a result.

- **Our planned clinical trials may not begin on time, or at all, and may not be completed on schedule, or at all.** The commencement or completion of any of our clinical trials may be delayed or halted for numerous reasons, including, but not limited to, the following:

    the FDA or other regulatory authorities do not approve a clinical trial protocol or a clinical trial, or place a clinical trial on hold, or changes in governmental regulations or administrative actions;

    the data and safety monitoring committee of a clinical trial recommends that a trial be placed on hold or suspended;

    patients do not enroll in clinical trials at the rate we expect;

    patients are not followed-up at the rate we expect;

    patients experience adverse side effects or events related to our products;

    patients die or suffer adverse medical effects during a clinical trial for a variety of reasons, including the advanced stage of their disease and medical problems, which may or may not be related to our product candidates;

    regulatory inspections of our clinical trials or manufacturing facilities, which may, among other things, require us to undertake corrective action or suspend or terminate our clinical trials if investigators find us not to be in compliance with regulatory requirements;

    the failure of our manufacturing process to produce finished products which conform to design and performance specifications;

    the interim results of the clinical trial are inconclusive or negative;

    pre-clinical or clinical data is interpreted by third parties in different ways; or

    our trial design, although approved, is inadequate to demonstrate safety and/or efficacy.

Clinical trials may require the enrollment of large numbers of patients, and suitable patients may be difficult to identify and recruit. Patient enrollment in clinical trials and completion of patient follow-up in clinical trials depend on many factors, including the size of the patient population, the nature of the trial protocol, the proximity of patients to clinical sites and the eligibility criteria for the study and patient compliance. For example, patients may be discouraged from enrolling in our clinical trials if the trial protocol requires them to undergo extensive posttreatment procedures to assess the safety and effectiveness of our stents, or they may be persuaded to participate in contemporaneous trials of competitive products. Delays in patient enrollment or failure of patients to continue to participate in a study may cause an increase in costs and delays or result in the failure of the trial.

Our clinical trial costs will increase if we have material delays in our clinical trials or if we need to perform more or larger clinical trials than planned. Adverse events during a clinical trial could cause us to repeat a trial, terminate a trial or cancel the entire program.

- **Pre-clinical development is a long, expensive and uncertain process, and we may terminate one or more of our pre-clinical development programs.** We may determine that certain pre-clinical product candidates or programs do not have sufficient potential to warrant the allocation of resources. Accordingly, we may elect to terminate our programs for such product candidates. If we terminate a pre-clinical program in which we have invested significant resources, our prospects will suffer, as we will have expended resources on a program that will not provide a return on our investment and will have missed the opportunity to have allocated those resources to potentially more productive uses.

- **We may not be able to protect our intellectual property or obtain necessary intellectual property rights from third parties, which could adversely affect our business.** Our success depends, in part, on ensuring that our intellectual property rights are covered by valid and enforceable patents or effectively maintained as trade secrets and our ability to detect violations of our intellectual property rights and enforce such rights against others.

The validity of our patent claims depends, in part, on whether prior art references described or rendered obvious our inventions as of the filing date of our patent applications. We may not have identified all prior art, such as U.S. and foreign patents or published applications or published scientific literature, that could adversely affect the validity of our issued patents or the patentability of our pending patent applications. For example, patent applications in the United States are maintained in confidence for up to 18 months after their filing. In some cases, however, patent applications remain confidential in the U.S. Patent and Trademark Office, which we refer to as the U.S. Patent Office, for the entire time prior to issuance as a U.S. patent.

Jefferies

Patent applications filed in countries outside the United States are not typically published until at least 18 months from their first filing date. Similarly, publication of discoveries in scientific or patent literature often lags behind actual discoveries. Therefore, we cannot be certain that we were the first to invent, or the first to file patent applications related to, our technology. In the event that a third party has also filed a U.S. patent application covering a similar invention, we may have to participate in an adversarial proceeding, known as an interference, declared by the U.S. Patent Office to determine priority of invention in the United States. It is possible that we may be unsuccessful in the interference, resulting in a loss of some portion or all of our U.S. patent positions. The laws in some foreign jurisdictions do not protect intellectual property rights to the same extent as in the United States, and many companies have encountered significant difficulties in protecting and defending such rights in foreign jurisdictions. If we encounter such difficulties or we are otherwise precluded from effectively protecting our intellectual property rights in foreign jurisdictions, our business prospects could be substantially harmed.

We have filed and are pursuing patent applications in the United States and other jurisdictions. We hold 117 issued U.S. and international patents and have 109 active U.S. and international patent applications that cover various aspects of our technology. We may not be able to obtain patent protection for key elements of our technology, as the patent positions of biotechnology and medical device companies are uncertain and involve complex legal and factual questions for which important legal issues are largely unresolved. For example, no consistent policy has emerged regarding the scope of health-related patent claims that are granted by the U.S. Patent Office or enforced by the U.S. federal courts. Rights under any of our issued patents may not provide us with commercially meaningful protection for our products or afford us a commercial advantage against our competitors or their competitive products or processes. In addition, even if a patent is issued, the coverage claimed in a patent application may be significantly reduced in the patent as granted. There can be no assurance that:

> patent applications will result in the issuance of patents;

> additional proprietary products developed will be patentable;

> licenses we have obtained from third parties that we use in connection with our technology will not be terminated;

> patents issued will provide adequate protection or any competitive advantages;

> patents will not be successfully challenged by any third parties; or

> the patents of others will not impede our or our collaborators' ability to commercialize our technology.

Furthermore, others may independently develop similar products or technologies or, if patents are issued to us, design around any patented technology developed by us, which could affect our potential to generate revenues and harm our results of operations.

Patent protection for our technology may not be available based on prior art. The publication of discoveries in scientific or patent literature often lags behind actual discoveries. As a consequence, there may be uncertainty as to whether we or a third party were the first creator of inventions covered by issued patents or pending patent applications or that we or a third party were the first to file patent applications for such inventions. Moreover, we might have to participate in interference proceedings declared by the U.S. Patent Office, or other proceedings outside the United States, including oppositions, to determine priority of invention or patentability, which could result in substantial cost to us even if the outcome were favorable. An unfavorable outcome in an interference or opposition proceeding could preclude us, our collaborators and our licensees from making, using or selling products using the technology or require us to obtain license rights from prevailing third parties. We do not know whether any prevailing party would offer us a license on commercially acceptable terms, if at all. We may also be forced to pay damages or royalties for our past use of such intellectual property rights, as well as royalties for any continued usage.

As part of our patent strategy, we have filed a variety of patent applications internationally. A major competitor filed an Opposition in the European Patent Office against one granted patent that we own which is related to certain of our technology. The European Patent Office validated our European patent, and the competitor has appealed the ruling. The ultimate outcome of this Opposition is uncertain at this time.

Our future success and competitive position depend in part on our ability to obtain and maintain certain proprietary intellectual property rights used in our approved products and principal product candidates. Any such success depends in part on effectively prosecuting claims against others who we believe are infringing our rights and by effectively defending claims of intellectual property infringement that may be brought by our competitors and others in the future. The stent-related markets have experienced rapid technological change and obsolescence in the recent past, and our competitors have strong incentives to stop or delay us from introducing new products and technologies.

**Jefferies**

We do not know whether the patents that we have received or may be able to obtain or license in the future, will be held valid or enforceable by a court or whether a competitor's technology or product will be found to infringe such patents. Further, we have no assurance that third parties will not properly or improperly modify or terminate any license they grant to us.

We may need to obtain licenses from third parties with respect to their intellectual property for use in connection with our technology, and we may need to obtain additional licenses for the development of our current or future products. Licenses may not be available on satisfactory terms or at all. If available, these licenses may obligate us to exercise diligence in bringing our technology to market and may obligate us to make minimum guarantee or milestone payments. These diligence and milestone payments may be costly and could seriously harm our business. We may also be obligated to make royalty payments on the sales, if any, of products resulting from licensed technology and may be responsible for the costs of filing and prosecuting patent applications. These costs could affect our results of operations and decrease our earnings.

Certain of our key technology includes trade secrets and know-how that may not be protected by patents. There can be no assurance that we will be able to protect our trade secrets. To help protect our rights, we undertake to require employees, consultants, advisors and collaborators to enter into confidentiality agreements. We cannot assure you that all employees, consultants, advisors and collaborators have signed such agreements, or that these agreements will adequately protect our trade secrets, know-how or other proprietary information in the event of any unauthorized use or disclosure. Furthermore, any confidentiality agreements in existence may be breached and we may not have adequate remedies for any such breach. Any disclosure of confidential data into the public domain or to third parties could allow our competitors to learn our trade secrets and use the information in competition against us.

- **Compulsory licensing and/or generic competition may affect our business in certain countries.** In a number of countries governmental authorities and other groups have suggested that companies which manufacture medical products (i.e., medical devices) should make products available at a low cost. In some cases, governmental authorities have held that where a medical device company does not do so, their patents might not be enforceable to prevent generic competition. Alternatively, some governmental authorities could require that we grant compulsory licenses to allow competitors to manufacture and sell their own versions of our products, thereby reducing our sales or the sales of our licensee(s). In all of these situations, the results of our operations in these countries could be adversely affected.

- **We may incur substantial costs as a result of litigation or other proceedings relating to patent and other intellectual property rights.** In connection with maintaining the value of our various intellectual property rights, we will evaluate the activities of others worldwide. Our success will depend, in part, on our ability to obtain patents, or licenses to patents, maintain trade secret protection and enforce our rights against others. Should it become necessary to protect those rights, we intend to pursue all cost-efficient strategies, including when appropriate negotiation or litigation in any relevant jurisdiction.

We intend to pursue and to defend vigorously any and all actions of third parties related to our patent portfolio and technology. Any failure to obtain and protect intellectual property could adversely affect our business and our ability to operate could be hindered by the proprietary rights of others.

Our involvement in intellectual property litigation could result in significant expense, adversely affecting the development of product candidates or sales of the challenged product or intellectual property and diverting the efforts of our technical and management personnel, whether or not such litigation is resolved in our favor. Some of our competitors may be able to sustain the costs of complex patent litigation more effectively than we can because they have substantially greater resources and intellectual property litigation may be used against us as a means of gaining a competitive advantage. Competing parties frequently file multiple suits to leverage patent portfolios across product lines, technologies and geographies and to balance risk and exposure between the parties. Uncertainties resulting from the initiation and continuation of any litigation could affect our ability to continue our operations. In the event of an adverse outcome as a defendant in any such litigation, we may, among other things, be required to:

> pay substantial damages or back royalties;

> cease the development, manufacture, use or sale of product candidates or products that infringe upon the intellectual property of others;

> expend significant resources to design around a patent or to develop or acquire non-infringing intellectual property;

> discontinue processes incorporating infringing technology; or

> obtain licenses to the infringed intellectual property.

We cannot assure you that we will be successful in developing or acquiring non-infringing intellectual property or that necessary licenses will be available upon reasonable terms, if at all. Any such development, acquisition or license could require the expenditure of substantial time and other resources and could have a material adverse effect on our business and financial results. If we cannot develop or acquire such intellectual property or obtain such licenses, we could encounter delays in any

**Jefferies**

introduction of products or could find that the development, manufacture or sale of products requiring such licenses could be prohibited.

If third parties file patent applications, or are issued patents claiming technology also claimed by us in pending applications, we may be required to participate in interference proceedings with the U.S. Patent Office, or other proceedings outside the United States, including oppositions, to determine priority of invention or patentability, which could result in substantial cost to us even if the eventual outcome were favorable.

- **Our ability to operate could be hindered by the proprietary rights of others.** A number of biotechnology and medical device companies as well as research and academic institutions have developed technologies, filed patent applications or received patents on various technologies that may be related to our business. Some of these technologies, applications or patents may conflict with or adversely affect our technologies or intellectual property rights, including those that we may license from others. Other parties may hold intellectual property rights that represent prior art or other potentially conflicting intellectual property. Any conflicts with the intellectual property of others could limit the scope of the patents, if any, that we may be able to obtain or result in the denial of our current or future patent applications altogether.

If patents that cover our activities are issued to other persons or companies, we could be charged with infringement. In the event that other parties' patents cover any portion of our activities, we may be forced to develop alternatives or negotiate a license for such technology. We do not know whether we would be successful in either developing alternative technologies or acquiring licenses upon reasonable terms, if at all. Obtaining any such licenses could require the expenditure of substantial time and other resources and could harm our business and decrease our earnings. If we do not obtain such licenses, we could encounter delays in the introduction of our products or could find that the development, manufacture or sale of products requiring such licenses is prohibited.

- **Technological advances and evolving industry standards could reduce our future product sales, which could cause our revenues to grow more slowly or decline.** The markets for our products are characterized by rapidly changing technology, changing customer needs, evolving industry standards and frequent new product introductions and enhancements. The emergence of new industry standards in related fields may adversely affect the demand for our products. This could happen, for example, if new standards and technologies emerged that were incompatible with deployments of our applications. In addition, any compounds, products or processes that we develop may become obsolete or uneconomical before we recover any of the expenses incurred in connection with their development. We cannot assure you that we will succeed in developing and marketing product enhancements or new products that respond to technological change, new industry standards, changed customer requirements or competitive products on a timely and cost-effective basis. Additionally, even if we are able to develop new products and product enhancements, we cannot assure you that they will achieve market acceptance.

- **We may be subject to damages resulting from claims that we or our employees have wrongfully used or disclosed alleged trade secrets of their former employers.** Many of our employees were previously employed at universities or other biotechnology or medical device companies, including our competitors or potential competitors. Although no such claims against us are currently pending, we may be subject to claims that these employees or we have inadvertently or otherwise used or disclosed trade secrets or other proprietary information of their former employers. Litigation may be necessary to defend against these claims. Even if we are successful in defending against these claims, litigation could result in substantial costs and be a distraction to management. If we fail in defending such claims, in addition to paying money claims, we may lose valuable intellectual property rights or personnel. A loss of key research personnel or their work product could hamper or prevent our ability to develop or commercialize certain product candidates, which could severely harm our business.

- **Changes in the laws relating to intellectual property may materially affect the nature, scope and enforceability of our intellectual property rights.** Legislation is currently pending before the United States Congress which may materially change U.S. patent laws. If enacted this legislation may affect our ability to obtain patent protection for our technology, enforce our patents against third parties, recover damages from third parties for patent infringement or obtain injunctive relief against third party infringers. Additionally, changes in international treaties, foreign laws with respect to the issuance or enforceability of patents or other intellectual property rights, and changes in the law due to judicial or administrative decisions may affect our ability to obtain or enforce our intellectual property rights.

- **We may incur significant costs complying with environmental laws and regulations.** Our research and development processes and future manufacturing operations will involve the use of hazardous materials. We are and will be subject to federal, state, provincial, local and other laws and regulations in the countries in which we operate or sell our products, which govern the use, manufacture, storage, handling and disposal of such materials and certain waste products. The risk of accidental contamination or injury from these materials cannot be completely eliminated. In the event of an accident or the discovery of pre-existing contamination at our facilities, we could be held liable for any damages that result and any such liability could exceed our resources. We may not be specifically insured with respect to this liability, and we do not know whether we will be required to incur significant costs to comply with environmental laws and regulations in the future, or whether our operations, business or assets will be harmed by current or future environmental laws or regulations.

**Jefferies**

■ **We face and will continue to face significant competition.** Competition from medical device companies, biotechnology companies and academic and research institutions is intense and is expected to increase. Many of our competitors and potential competitors have substantially greater product development capabilities, experience conducting clinical trials and financial, scientific, manufacturing, sales and marketing resources and experience than our company. Some of these competitors include Johnson & Johnson, Boston Scientific, and numerous public and private companies. We also face competition from non-medical device companies, such as pharmaceutical companies, which may offer non-surgical alternative therapies for disease states which are currently or intended to be treated using our products. Other companies may:

    develop and obtain patent protection for products earlier than us;

    design around patented technology developed by us;

    obtain regulatory approvals for such products more rapidly;

    have greater manufacturing capabilities and other resources;

    have larger or more experienced sales forces;

    develop more effective or less expensive products; or

    have greater success in obtaining adequate third-party payer coverage and reimbursement for their competing products.

While we intend to expand our technological capabilities in order to remain competitive, there is a risk that:

    research and development by others will render our technology or product candidates obsolete or noncompetitive;

    treatments or cures developed by others will be superior to any developed by us; and

    any products developed by us will not be preferred to any existing or newly-developed technologies.

■ **The commercial potential of our products and product candidates will be significantly limited if we are not able to obtain adequate levels of reimbursement or market acceptance for them.** Our ability to commercialize human therapeutic products and product candidates successfully will depend in part on the extent to which coverage and reimbursement for such products and related treatments will be available from government health administration authorities, private health insurers and other third-party payers or supported by the market for these products. There can be no assurance that third-party payers' coverage and reimbursement will be available or sufficient for the products we might develop.

Third party payers are increasingly challenging the price of medical products and services and instituting cost containment measures to control or significantly influence the purchase of medical products and services. These cost containment measures, if instituted in a manner affecting the coverage of or payment for our products, could have a material adverse effect on our ability to operate profitably. In some countries in the EU and in the United States, significant uncertainty exists as to the reimbursement status of newly-approved healthcare products, and we do not know whether adequate third-party coverage and reimbursement will be available for us to realize an appropriate return on our investment in product development, which could seriously harm our business. In the United States, while reimbursement amounts previously approved appear to have provided a reasonable rate of return, there can be no assurance that our products will continue to be reimbursed at current rates or that third party payers will continue to consider our products cost-effective and provide coverage and reimbursement for our products, in whole or in part.

We cannot be certain that our products will gain commercial acceptance among physicians, patients and third party payers, even if necessary international and U.S. marketing approvals are maintained. We believe that recommendations and endorsements by physicians will be essential for market acceptance of our products, and we do not know whether these recommendations or endorsements will be obtained. We also believe that surgeons will not use these products unless they determine, based on clinical data and other factors, that the clinical benefits to patients and cost savings achieved through use of these products outweigh their cost. Acceptance among physicians may also depend upon the ability to train doctors, surgeons and other potential users of our products and the willingness of such users to learn these relatively new techniques.

■ **Future legislation or regulatory changes to, or consolidation in, the healthcare system may affect our ability to sell our product profitably.** There have been, and we expect there will continue to be, a number of legislative and regulatory laws and regulations enacted to change the healthcare system, and some involve changes that could significantly affect our business, including taxes on medical devices such as ours. Efforts by governmental and third-party payers to reduce health care costs or the announcement of legislative proposals or reforms to implement government controls could cause a reduction in sales or in the selling price of our products, which would seriously harm our business. Additionally, initiatives to reduce the cost of healthcare have resulted in a consolidation trend in the healthcare industry, including hospitals. This in turn has resulted in greater pricing pressures and the exclusion of certain suppliers from certain market segments as consolidated groups such as group purchasing organizations, independent delivery networks and large single accounts continue to consolidate purchasing decisions for some of our hospital customers. We expect that market demand, government regulation, and third-party

**Jefferies**

reimbursement policies will continue to change the worldwide healthcare industry, resulting in further business consolidations and alliances among our customers and competitors, which may reduce competition, exert further downward pressure on the prices of our products and may adversely impact our business, financial condition or results of operations.

- **We must receive regulatory approval for each of our product candidates before they can be sold commercially in the United States or internationally, which can take significant time and be very costly.** The development, manufacture and sale of medical devices and human therapeutic products in the United States and internationally is governed by a variety of statutes and regulations. These laws require, among other things:

    approval of manufacturing facilities and practices;

    adequate and well-controlled research and testing of products in pre-clinical and clinical trials;

    review and approval of submissions containing manufacturing, pre-clinical and clinical data in order to obtain marketing approval based on establishing the safety and efficacy of the product for each use sought, including adherence to good manufacturing practices during production and storage; and

    control of marketing activities, including advertising and labeling.

The product candidates proposed for development by us or our collaborators will require significant research, development, pre-clinical and clinical testing, pre-market review and approval, and investment of significant funds prior to their commercialization. We will depend on our collaborators for regulatory approval and compliance, and have little or no control over these matters. The process of completing clinical testing and obtaining such approvals is likely to take many years and require the expenditure of substantial resources, and we do not know whether any clinical studies by us or our collaborators will be successful, that regulatory approvals will be received, or that regulatory approvals will be obtained in a timely manner. Despite the time and resources expended by us, regulatory approval is never guaranteed. Even if regulatory approval is obtained, regulatory agencies may limit the approval to certain diseases, conditions or categories of patients who can use them.

If any of our development programs are not successfully completed in a timely fashion, required regulatory approvals are not obtained in a timely fashion, or products for which approvals are obtained are not commercially successful, it could seriously harm our business.

- **We may be unsuccessful in marketing, selling and distributing our products.** We may seek to distribute a number of our products worldwide. If our distribution personnel or methods are not sufficient to ensure we have supply to meet demand for our products or if there is a quality control failure with our products, it could harm our prospects, business, financial condition and results of operations. We have limited experience in marketing and selling our products. In order to achieve commercial success for our approved products, we may have to develop an effective marketing and sales force, or we will have to enter into arrangements with third parties to market and sell our products. If we develop our own marketing and sales capabilities, we will be competing with other companies that currently have experienced and well-funded marketing and sales operations. To the extent that we enter into copromotion or other marketing and sales arrangements with other companies, any revenues received will be dependent on the efforts of others, and we do not know whether these efforts will be successful. Failure to develop a direct sales and marketing force or enter into appropriate arrangements with other companies to market and sell our products will reduce our ability to generate revenues.

**Jefferies**

# Appendix

## OPERATIONS







**Jefferies**







**Jefferies**