# EXHIBIT F

# TODD FOSTER LAW GROUP
## Attorneys at Law

Todd Foster, Esq.  
David Knox, Esq.  
Leighton Leib, Esq.  
Warren A. Zimmerman, Esq.  
Pamela McCullough, Investigator

1881 W. Kennedy Blvd.  
Tampa, Florida 33606  
Phone: (813) 229-7373  
Facsimile: (813) 280-9981  
www.tfosterlaw.com

**PROTECTED INFORMATION UNDER F.R.E. 408**

**PERSONAL AND CONFIDENTIAL**

JUNE 16, 2016

**By Certified and Regular U.S. Mail**

Michael Sharp, Esq.  
General Counsel  
Jefferies Group LLC  
520 Madison Avenue  
New York, New York 10022

**By Certified and Regular U.S. Mail**

Fred Charles Ostrove  
520 Madison Avenue  
New York, New York 10022

RE:   Palmaz Scientific

Gentlemen:

We represent Robert Tannenbaum, who purchased and held $250,000 of stock in the now-bankrupt entity Palmaz Scientific ("Palmaz") as a result of statements made and information omitted by Jefferies Group LLC ("Jefferies") via its employee Fred Charles Ostrove across a series of direct conversations with Mr. Tannenbaum between 2011 and 2016. Mr. Ostrove has acknowledged, and apologized for, his central role in causing Mr. Tannenbaum to make this investment during an April 2016 telephone call with Mr. Tannenbaum, which we can independently corroborate.

At the outset, please note that although we understand there is a present dispute between Jefferies and Palmaz regarding the scope and duration of their fundraising partnership, Mr. Tannenbaum has made clear that during each of the below-described direct conversations with Mr. Ostrove, he understood Mr. Ostrove to be acting as a Jefferies representative performing his contracted-for role of Palmaz placement agent. Moreover, Mr. Tannenbaum was aware that Mr. Ostrove was a licensed investment advisor at all times during their discussions, and had been for over three decades. Mr. Tannenbaum is a licensed investment advisor professional as well, and

reasonably presumed that Mr. Ostrove's conduct in pressing Mr. Tannenbaum to invest in and hold Palmaz securities was in keeping with the heightened ethical and disclosure obligations both men shared as licensed financial services professionals. It now appears that this was not the case, and that your services directed toward Mr. Tannenbaum were at minimum negligently rendered.

In or around October 2011, Mr. Tannenbaum recalls that Mr. Ostrove contacted him in an attempt to entice him to invest in Palmaz. Mr. Tannebanum recalls Mr. Ostrove aggressively touting Palmaz during this call, claiming its founder was "a genius" and its forthcoming heart stent technologies soon to be indispensable, and promising he had invested his own money in the entity. Mr. Tannenbaum listened politely and declined to make the investment.

In or around December 2011, Mr. Tannenbaum recalls that Mr. Ostrove tried again, escalating his pitch to include statements vouching for the new Palmaz CEO, Steven Solomon, despite his total lack of familiarity with the biotech field; assuring that established and recognizable entities such as Johnson & Johnson had "a piece of the deal"; promising that the Palmaz patents were unusually valuable; and guaranteeing a tremendous rate of return (a "three or four banger") were Mr. Tannenbaum to invest in Palmaz.

We have reason to believe these statements were false, misleading, incomplete, and, at the very least, negligently rendered. For instance, as reflected in the Statement of Corporate Ownership filed by Palmaz in *In Re Palmaz Scientific Inc.*, No. 16-50552 (Bankr. W.D. Tex. 2016), Mr. Ostrove is nowhere listed as an equity owner of Palmaz, despite his above-referenced representation to the contrary to Mr. Tannenbaum. As a result of Mr. Ostrove's conduct set forth above, Mr. Tannenbaum purchased 1000 shares of Series B Preferred shares, valued at $250.00 per share, in Palmaz on January 26, 2012. A stock certificate evidencing same was issued the following month.

Nevertheless, Mr. Ostrove's Palmaz-related conduct did not end there. Mr. Tannenbaum recalls being contacted directly by Mr. Ostrove roughly every few months, at which time Mr. Ostrove provided assurances as to the Palmaz investment, including with respect to the success of the clinical trials of Palmaz products; the leadership and fundraising abilities of CEO Solomon (including via facilitating a direct telephonic conversation between Mr. Solomon and Mr. Tannenbaum during which Mr. Tannenbaum recalls the now-terminated Palmaz CEO reassuring him of the sound nature of his investment); the value of the patents; and the good faith and confidence of Dr. Palmaz himself as reflected in his decision to invest his own money in the company.

Mr. Tannenbaum further recalls that Mr. Ostrove repeatedly dissuaded him from exploring the secondary market for and/or favorable tax treatment of his Palmaz investment during these contacts. Recently, in the months prior to Palmaz's bankruptcy filing, it appears Mr. Ostrove attempted to diminish the negative impact of Steven Solomon's 2015 dismissal and related litigation arising out of his conduct as CEO; as well as the pre-bankruptcy decision by a leading hedge fund to pull out of its arrangement with Palmaz.

For reasons including the 2016 Palmaz bankruptcy; issues surrounding Steven Solomon's and Dr. Palmaz's stewardship of Palmaz; and your analysis of the strength of the Palmaz product line, it appears that many if not all of the above statements were false, incomplete, misleading, and negligently if not fraudulently rendered.

Most recently, in April 2016, Mr. Ostrove, during a phone call with Mr. Tannenbaum, took responsibility for the failure of Mr. Tannenbaum's Palmaz investment, stating that he felt "incredibly bad about it." He admitted that he "really" didn't know "the real story" regarding Palmaz, and confirmed that he'd previously championed CEO Solomon. He further admitted to receiving prior press and investor feedback that Palmaz may have been a questionable investment, and acknowledged that he had previously discouraged Mr. Tannenbaum from exploring the secondary market or taking a tax write-off for his Palmaz investment. Finally, Mr. Ostrove agreed that he had been a good salesman on the deal.[1] We can independently corroborate each of the above statements and admissions made on that April 2016 call.

Mr. Tannenbaum believes that he has colorable claims against Jefferies and its agent Mr. Ostrove for your Palmaz-related conduct, and is prepared to press those claims before the appropriate tribunal if and when necessary. Nevertheless, in recognition of the inherent uncertainty and time-consuming nature of the litigation process, Mr. Tannenbaum has requested we send this letter and offer you reasonable time to respond and discuss alternative means of remediating the Palmaz-related harm caused to Mr. Tannenbaum.

If we have not heard from you by **July 1, 2016**, we will presume no such discussions are forthcoming and proceed accordingly. Moreover, the transmission of this letter and accompanying offer of a reasonable window to discuss settlement alternatives does not operate as a waiver of any relevant rights or remedies available to Mr. Tannenbaum, which are reserved.

We are available to discuss these matters further at your earliest convenience.

Very truly yours,

Leighton Leib

---

[1] As well, we understand that Mr. Ostrove recently attempted to assuage Mr. Tannenbaum by referencing the fact that he purchased preferred shares in Palmaz, which receive priority repayment in bankruptcy actions; in reality, Mr. Tannenbaum's shares, like all shares in his class, were automatically converted to common stock in 2015, prior to the Palmaz bankruptcy.

**Todd Foster Law Group**

1881 W. Kennedy Blvd
Tampa, FL 33606

$0.46⁵
US POSTAGE
FIRST-CLASS

071V00856370
33606
000002698

Michael Sharp, Esq.
General Counsel
Jeffries Group, LLC
520 Madison Avenue
New York, NY 10022

JUN 21 '16 AM 11:42

**PERSONAL & CONFIDENTIAL**

10022-421399